**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MICHELLE GILSTRAP, an individual, *Plaintiff-Appellant*, | No. 11-55271 |
| v. | D.C. No. 2:10-cv-06131-JHN-JC |
| UNITED AIR LINES, INC., a Delaware Corporation, *Defendant-Appellee*. | OPINION |

Appeal from the United States District Court
for the Central District of California
Jacqueline H. Nguyen, District Judge, Presiding

Argued and Submitted
May 9, 2012—Pasadena, California

Filed March 12, 2013

Before: Harry Pregerson, Susan P. Graber,
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

## SUMMARY[*]

### Air Carrier Access Act / Preemption

The panel affirmed in part and reversed in part the district court's dismissal of an action alleging causes of action under California state tort law and Title III of the Americans with Disabilities Act on the basis that an airline did not provide the plaintiff with adequate assistance for moving through the airport.

Reversing in part, and adopting the framework used by the Third Circuit, the panel held that the Air Carrier Access Act, an amendment to the Federal Aviation Act, and its implementing regulations preempt state standards of care with respect to the circumstances under which airlines must provide assistance to passengers with disabilities in moving through the airport but do not preempt any state remedies that may be available when airlines violate those standards. The panel held that the ACAA and its implementing regulations do not preempt state-law personal-injury claims involving how airline agents interact with passengers with disabilities who request assistance in moving through the airport.

Affirming the dismissal of the ADA claim, the panel held that an airport terminal is not a place of public accommodation.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Mark P. Meuser, Meuser Law Group, Inc., Walnut Creek, California, for Appellant.

Richard G. Grotch, Coddington, Hicks & Danforth, Redwood City, California, for Appellee.

---

**OPINION**

BERZON, Circuit Judge:

Michelle Gilstrap has difficulty walking because of osteoarthritis and other health problems. She alleges that, on two airplane trips in 2008 and 2009, United Air Lines ("United") did not provide her with adequate assistance moving through the airport and that she suffered physical and emotional injuries as a result. Gilstrap sued United, alleging several causes of action under California state tort law and a violation of Title III of the Americans with Disabilities Act of 1990 ("ADA"). Our questions are (1) whether Gilstrap's state-law claims are preempted by the federal Air Carrier Access Act ("ACAA") and, if so, in what respect; and (2) whether airport terminals are among the "places of public accommodation" governed by Title III of the ADA.

## I. FACTUAL AND PROCEDURAL HISTORY

Michelle Gilstrap has difficulty walking because she has a collapsed disc in her back, one replaced knee, another knee

that needs replacing, and osteoarthritis. In August 2008,[1] she flew on United from Los Angeles to Calgary, from Calgary to Chicago,[2] and finally from Milwaukee back to Los Angeles (via Denver). Gilstrap again flew on United in December 2009, this time from Burbank, California, to Madison, Wisconsin (via Denver).[3] When booking both sets of flights, Gilstrap requested that United provide her with wheelchair assistance for moving through the airports.

During both trips, United failed repeatedly to provide Gilstrap with the assistance that she requested. At one airport, Gilstrap located a wheelchair on her own; at other airports she was provided a wheelchair by United only after prolonged insistence and up to 45 minutes of waiting; and at others she was never able to locate a wheelchair at all and had to walk. Gilstrap alleges various physical injuries as a result of having to walk, including, after the August 2008 trip, severe pain that was treated with an epidural injection. Gilstrap also alleges that United agents yelled at her, expressed skepticism that she actually needed a wheelchair, and twice directed her to stand in line (which she could not do because of her disabilities). At one point during her travels, a United agent whom she asked

---

[1] Because we are evaluating a district court's dismissal pursuant to Rule 12(b)(6), we take the facts alleged in Gilstrap's complaint as true and construe them in the light most favorable to her. *Cervantes v. United States*, 330 F.3d 1186, 1187 (9th Cir. 2003).

[2] Gilstrap was originally scheduled to fly this leg from Calgary to Milwaukee, but was transferred to a Calgary-Chicago flight in the course of the interactions at issue in this lawsuit.

[3] For one leg of this itinerary, Gilstrap's United flight was cancelled and United rebooked her on a Mesa Airlines flight. Because she was still flying on a United ticket, this fact does not alter our analysis.

for assistance unilaterally rebooked her onto a later flight, telling her that "this was what she got for refusing to stand in line."

Gilstrap sued United, alleging several counts under California tort law, including negligence, negligent misrepresentation, breach of duty of a common carrier, intentional infliction of emotional distress, and negligent infliction of emotional distress. In addition, the complaint maintains that United violated Title III of the ADA. Gilstrap seeks compensatory damages for physical and emotional injuries, including reimbursement for her medical bills, exemplary and punitive damages, and litigation costs. Gilstrap does not allege a cause of action under the ACAA itself. Rather, her complaint cites the ACAA as relevant to establishing her state-law negligence claims. Under the California evidentiary rule of "negligence per se," a violation of "a statute, ordinance, or regulation" can support a rebuttable presumption of failure to exercise due care. Cal. Evid. Code § 669(a)(1).

United filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). The district court granted the motion in its entirety, dismissing Gilstrap's complaint with prejudice. The district court held that all of Gilstrap's California tort claims were both conflict- and field-preempted by the ACAA.

The primary basis for the district court's ruling was that "[t]he ACAA does not expressly provide a private right of action for violations of the statute or its regulations," but instead "provides for administrative investigation of complaints." On that ground, the district court concluded that Congress intended the Federal Aviation Act administrative

enforcement scheme to be the exclusive remedy for violations of the ACAA and its regulations and that state personal-injury lawsuits against airlines would conflict with that congressional intent. The district court further held that Gilstrap's claims were field-preempted by the ACAA regulations pertaining to wheelchair assistance codified in 14 C.F.R. part 382, subpart G. As to Gilstrap's ADA claim, the district court held that Title III of the ADA does not apply to airport terminals, because the statute applies only to "places of public accommodation" and expressly excludes terminals for aircraft from its definition of that phrase.

## II. STATUTORY AND REGULATORY BACKGROUND

### A.  The Air Carrier Access Act

The ACAA is an amendment to the Federal Aviation Act ("FAA").[4] The original FAA, passed in 1958, included a requirement that air carriers not "subject any particular person . . . to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever." 49 U.S.C. App. § 1374 (1982), *repealed by* Pub. L. No. 103-272, 108 Stat. 745, 1141 (1994). This requirement was repealed by the Airline Deregulation Act of 1978, 49 U.S.C. App. § 1301, *repealed by* Pub. L. No. 103-272, 108 Stat. 745, 1141 (1994), leaving passengers with disabilities without express protection against discrimination by

---

[4] The FAA and its various amendments, including the ACAA, are codified in Title 49, Subtitle VII of the U.S. Code. *See* 49 U.S.C. § 40101 *et seq.* For ease of reference, we refer to these provisions collectively as the FAA, except where we are discussing a specific amendment, such as the ACAA.

commercial airlines. *See Shinault v. Am. Airlines, Inc.*, 936 F.2d 796, 802 (5th Cir. 1991).

A different statute, § 504 of the Rehabilitation Act of 1973 provides generally that individuals with disabilities may not be excluded from or discriminated against by federally-funded programs. *See U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 599 (1986). In 1979, the Civil Aeronautics Board, the federal agency then in charge of airline regulation, promulgated regulations applying § 504 to those commercial airlines that received direct federal subsidies. *Id.* at 600–01. Organizations representing individuals with disabilities (collectively, Paralyzed Veterans of America, or "PVA"), challenged those regulations, seeking to apply § 504 to *all* commercial airlines, on the ground that airlines not receiving direct federal subsidies were indirect recipients of federal funding for airport construction and for the federally operated air traffic control system. *Id.* The Supreme Court rejected PVA's arguments, holding that commercial airlines were "beneficiaries," not "recipients," of federal grants for airport construction and that the air traffic control system was not "a form of federal financial assistance to airlines." *Id.* at 607, 611.

Congress responded to *Paralyzed Veterans* by passing the ACAA. An amendment to the FAA, the ACAA "provide[d] that prohibitions of discrimination against handicapped individuals shall apply to air carriers." Air Carrier Access Act of 1986, Pub. L. No. 99-435, § 2(a), 100 Stat. 1080; *see Shinault*, 936 F.2d at 802. In its original form, the ACAA prohibited air carriers from "discriminat[ing] against any otherwise qualified handicapped individual, by reason of such handicap, in the provision of air transportation," and directed the Secretary of Transportation to "promulgate regulations to

ensure non-discriminatory treatment of qualified handicapped individuals consistent with safe carriage of all passengers on air carriers." Air Carrier Access Act of 1986, Pub. L. No. 99-435, § 3, 100 Stat. 1080.[5]

In its current version, effective December 12, 2003, the pertinent sections of the ACAA read as follows:

> § 41705. Discrimination against handicapped individuals
>
> **(a)    In    general**.–In    providing    air transportation,   an   air   carrier,   including (subject to section 40105(b)) any foreign air carrier,   may   not   discriminate   against   an otherwise   qualified   individual   on   the following grounds:
>
>> **(1)** the individual has a physical or mental impairment   that   substantially   limits   one   or more major life activities.
>>
>> **(2)** the individual has a record of such an impairment.

---

[5] Congress  has  amended  the  ACAA  three  times:  in  1994,  adding provisions to clarify that "a separate violation occurs under [the statute] for each individual act of discrimination prohibited" and to require the Secretary of Transportation to "investigate each complaint of a violation," Pub.  L.  No.  103-272,  §  1(e),  July  5,  1994,  108  Stat.  1141;  in  2000,  to expand its application to foreign air carriers, Pub. L. 106-181, Title VII, §  707(a),  Apr.  5,  2000,  114  Stat.  61,  158;  and  in  2003,  to  make  minor technical changes. *See* Pub. L. No. 108-176, Title V, § 503(d)(1), Dec. 12, 2003, 117 Stat. 2490, 2559.

**(3)** the individual is regarded as having such an impairment.

**(b) Each act constitutes separate offense.**–For purposes of section 46301, a separate violation occurs under this section for each individual act of discrimination prohibited by subsection (a).

**(c) Investigation of complaints.--**

**(1) In general.**–The Secretary shall investigate each complaint of a violation of subsection (a).

49 U.S.C. § 41705. Although the ACAA itself no longer includes an express directive that the Secretary of Transportation promulgate regulations,[6] it is covered by the FAA's general authorization that the Secretary "may take action . . . consider[ed] necessary to carry out" the FAA's "Air Commerce and Safety" provisions, "including conducting investigations, prescribing regulations, standards, and procedures, and issuing orders." *Id.* § 40113(a).

Pursuant to that authorization, the Department of Transportation ("DOT") issued regulations, codified at 14 C.F.R. Part 382, specifying the detailed requirements that airlines must meet to comply with the ACAA. The regulations impose four general duties on air carriers: "not [to] discriminate against any qualified individual with a

---

[6] That directive was removed when the FAA as a whole was reorganized in 1994. *See* Revision of Title 49, United States Code Annotated, "Transportation," Pub. L. No. 103-272, July 5, 1994, 108 Stat. 745.

disability, by reason of such disability, in the provision of air transportation"; "not [to] require a qualified individual with a disability to accept special services . . . that the individual does not request"; "not [to] exclude a qualified individual with a disability from or deny the person the benefit of any air transportation or related services that are available to other persons," with certain limited exceptions; and "not [to] take any adverse action against an individual (e.g., refusing to provide transportation) because the individual asserts, on his or her own behalf or through or on behalf of others, rights protected" by the regulations or the ACAA. 14 C.F.R. § 382.11(a).[7]

With respect to assistance moving through the airport, air carriers must "provide or ensure the provision of assistance requested by or on behalf of a passenger with a disability . . . in transportation between gates to make a connection to another flight" and "in moving from the terminal entrance (or a vehicle drop-off point adjacent to the entrance) through the airport to the gate for a departing flight, or from the gate to the terminal entrance (or a vehicle pick-up point adjacent to the entrance after an arriving flight)," including "assistance in accessing key functional areas of the terminal, such as ticket counters and baggage claim." *Id.* § 382.91(a)–(b). Such assistance must include, if the passenger requires it, assistance "with transporting [the passenger's] gate-checked or carry-on luggage." *Id.* § 382.91(d). Carriers must also

---

[7] The current regulations, effective May 20, 2009, replaced the less detailed 1990 regulations. *See* Nondiscrimination on the Basis of Disability in Air Travel, 73 Fed. Reg. 27614-01 (May 13, 2008). We cite throughout to the 2009 regulations. Gilstrap's first trip was covered by the 1990 regulations, and her second by the 2009 regulations. For present purposes, however, the differences do not matter, although they conceivably could later in this litigation.

"promptly provide or ensure the provision of assistance requested by or on behalf of passengers with a disability . . . in enplaning and deplaning," including, "as needed, the services of personnel and the use of ground wheelchairs, accessible motorized carts, boarding wheelchairs, and/or on-board wheelchairs . . . and ramps or mechanical lifts." *Id.* § 382.95(a).

The DOT regulations also explain the training requirements that air carriers must meet: Carriers must, for example, train "all personnel who deal with the traveling public, as appropriate to the duties of each employee," in, among other topics, the requirements of the ACAA regulations; the airline's procedures regarding passengers with disabilities; "appropriate boarding and deplaning assistance procedures that safeguard the safety and dignity of passengers"; and "awareness and appropriate responses to passengers with a disability." *Id.* § 382.141(a).

The ACAA is enforced through three administrative mechanisms. First, the Act directs the Secretary of Transportation to collect and publish data on disability-related complaints and to report annually to Congress on all complaints received. 49 U.S.C. § 41705(c)(2)–(3). Second, the implementing regulations require that each airline maintain an internal dispute resolution program for collecting, responding to, and reporting passenger complaints of discrimination on the basis of a disability. *See* 14 C.F.R. § 382.151 *et seq.*

Finally, the FAA provides a general administrative enforcement scheme for all its "Air Commerce and Safety" provisions, which include the ACAA. Under this scheme, any person may file a complaint with the Secretary of

Transportation about an alleged regulatory violation. 49 U.S.C. § 46101(a)(1). After investigation,[8] notice, and an opportunity for a hearing, the Secretary "shall issue an order to compel compliance" if a violation is found. *Id.* § 46101(a)(4). The DOT may also impose civil penalties upon air carriers of up to $25,000 per violation. *Id.* § 46301(a). Pursuant to certain procedural requirements, any person "disclosing a substantial interest in an order issued by the Secretary of Transportation" may petition for judicial review of that order in a U.S. court of appeals. *Id.* § 46110.

These remedies are not exclusive, however: The FAA provision cautions that "[a] remedy under this part is in addition to any other remedies provided by law," *id.* § 40120(c), and requires DOT-certified air carriers to maintain liability insurance sufficient to pay for bodily injury, death, loss of property, or damage to property "resulting from the operation or maintenance of the aircraft," *id.* § 41112.

We have not squarely decided in this circuit whether, in addition to these administrative enforcement mechanisms, the ACAA may be enforced through private lawsuits.[9] Shortly after its enactment, two circuits interpreted the ACAA to

---

[8] Although the general FAA enforcement scheme provides for an investigation only "if a reasonable ground appears," 49 U.S.C. § 46101(a)(1)–(2), the ACAA itself requires the Secretary to investigate all complaints of an ACAA violation, *see id.* § 41705(c)(1).

[9] Without deciding the question, we addressed the merits of claims brought under the ACAA in *Newman v. American Airlines, Inc.*, 176 F.3d 1128 (9th Cir. 1999). Also, we held that the ACAA includes an implied private cause of action in a non-precedential memorandum disposition. *See Adiutori v. Sky Harbor Int'l Airport*, 103 F.3d 137 (9th Cir. 1996) (unpublished), at *3. Both cases predate *Alexander*, 532 U.S. 275.

imply a private cause of action. *Shinault*, 936 F.2d at 800; *Tallarico v. Trans World Airlines, Inc.*, 881 F.2d 566, 570 (8th Cir. 1989). After those cases were decided, however, *Alexander v. Sandoval*, 532 U.S. 275 (2001), narrowed the framework for evaluating whether a statute implies a private cause of action. All three circuits to consider the question since *Sandoval* have concluded that the ACAA does not imply a private cause of action. *See Lopez v. Jet Blue Airways*, 662 F.3d 593, 596–97 (2d Cir. 2011); *Boswell v. Skywest Airlines, Inc.*, 361 F.3d 1263, 1269–71 (10th Cir. 2004); *Love v. Delta Air Lines*, 310 F.3d 1347, 1354–59 (11th Cir. 2002). We need not, and do not, reach that question in this opinion, because Gilstrap does not allege a cause of action under the ACAA.

**B.  The Americans with Disabilities Act**

Congress passed the ADA in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." Pub. L. No. 101-336, 104 Stat. 327 (July 26, 1990), *codified at* 42 U.S.C. § 12101(b)(2). The ADA includes three main sections — Title I, which concerns employment discrimination, 42 U.S.C. § 12111 *et seq.*; Title II, which governs access to public services, *id.* § 12131 *et seq.*; and Title III, which governs access to privately operated public accommodations, such as restaurants and movie theaters, *id.* § 12181 *et seq.*

Title III prohibits discrimination against people with disabilities in "public accommodations" and includes an express list of the "private entities [that] are considered public accommodations" for purposes of the statute. *Id.* § 12181(7). The list includes "a terminal, depot, or other station used for

specified public transportation." *Id.* § 12181(7)(G). The term "specified public transportation" is defined, in turn, as "transportation by bus, rail, or any other conveyance *(other than by aircraft)* that provides the general public with general or special service (including charter service) on a regular and continuing basis." *Id.* § 12181(10) (emphasis added).

Recognizing that aircraft are expressly excluded from the statutory definition of "specified public transportation" whose terminals are governed by Title III, the Department of Justice ("DOJ"), which implements the ADA, interprets Title III as not covering "[t]he operations of any portion of any airport that are under the control of an air carrier," and specifies that such areas "are covered by the Air Carrier Access Act," not the ADA, and thus under the regulatory jurisdiction of the DOT, not the DOJ. *See* 28 C.F.R. pt. 36 app. C.[10] Concomitantly, "[p]laces of public accommodation located within airports," but not under the control of air carriers, "such as restaurants, shops, lounges, or conference centers," are covered by Title III. *Id.*[11]

---

[10] In turn, the DOT's ACAA-implementing regulations provide that air carriers shall be "deemed to comply" with their ACAA obligation to make air terminals accessible

> if the facilities meet requirements applying to places of public accommodation under Department of Justice (DOJ) regulations implementing Title III of the Americans with Disabilities Act (ADA).

14 C.F.R. § 382.51(a)(1).

[11] The ADA regulations do note that airports operated by public entities are covered by Title II of the ADA. 28 C.F.R. pt. 36 app. C. Gilstrap does not make any claims under Title II, and the complaint does not allege that any of the airports through which she traveled was publicly operated.

## III. ANALYSIS

This case was dismissed at the pleading stage, for failure to state a claim. Accepting the facts in the complaint as true and in the light most favorable to the plaintiff, we must determine whether the complaint's factual allegations, taken as true, state a claim for relief that is plausible on its face. *United States v. Corinthian Colls.*, 655 F.3d 984, 991 (9th Cir. 2011).

### A.  ACAA preemption and Gilstrap's state-law claims

Federal law may preempt state law in three ways. First, "Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision." *Arizona v. United States*, 567 U.S. —, 132 S. Ct. 2492, 2500–01 (2012). Second, "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Id.* at 2501. Finally, "state laws are preempted when they conflict with federal law." *Id.* Regardless of the type of preemption involved — express, field, or conflict — "[t]he purpose of Congress is the ultimate touchstone of pre-emption analysis." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (internal quotation marks omitted).

The ACAA does not contain an express preemption provision.[12] We therefore analyze whether it implies a

---

[12] There are two limited preemption provisions in the FAA as a whole, neither of which is implicated in this appeal. The Airline Deregulation Act of 1978 preempts state regulations "related to a price, route, or service" of airlines, 49 U.S.C. § 41713(b)(1), while the General Aviation

congressional intent to preempt state personal-injury lawsuits under either field or conflict preemption and, if so, in what respect.

## 1. Field preemption

Before analyzing whether the ACAA has any field-preemptive effect upon state personal-injury lawsuits, we first review our case law on field preemption under the FAA more generally. The FAA includes two important statements indicating a general congressional intent *not* to preempt state-law tort suits against airlines: the savings clause providing that "[a] remedy under this part is in addition to any other remedies provided by law," 49 U.S.C. § 40120(c), and the requirement that airlines maintain liability insurance for injuries and property damage, *id.* § 41112. The latter requirement is important as to the statute's preemptive status, because "the FAA doesn't create a federal cause of action for personal injury suits"; the liability insurance clause therefore "can only contemplate tort suits brought under state law." *Martin ex rel. Heckman v. Midwest Express Holdings, Inc.*, 555 F.3d 806, 808 (9th Cir. 2009).

Reflecting these provisions, we have in several instances held that state-law personal-injury claims are not displaced by the FAA. For instance, we held in *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1261 (9th Cir. 1998) (en banc), that the Airline Deregulation Act of 1978, which amended the FAA to include an express preemption provision applicable

---

Revitalization Act of 1994 provides an eighteen-year statute of repose for product liability claims against airplane manufacturers, 49 U.S.C. § 40101 note §§ 2(a)(2), 3(3).

to certain state regulations,[13] was "intended to preempt only state laws and lawsuits that would adversely affect the economic deregulation of the airlines" and not "to preempt passengers' run-of-the-mill personal injury claims." "Although *Charas* did not consider FAA preemption" in general, its clear implication is that the FAA is not broadly field-preemptive of state tort suits: *Charas* "reversed several district court and panel decisions for interpreting [Airline Deregulation Act] preemption too broadly," a holding that would have been unnecessary "if all the claims at issue were preempted anyway by the FAA." *Martin*, 555 F.3d at 811.

Later, in *Martin*, we developed with more precision than in *Charas* the overall principles of FAA field preemption. First, *Martin* considered whether an earlier case, *Montalvo v. Spirit Airlines*, 508 F.3d 464 (9th Cir. 2007), had determined that *all* state-law personal injury claims related to aviation are broadly field-preempted by the FAA. In *Montalvo*, we had concluded that the plaintiffs' negligence claims, premised on a failure-to-warn theory, were preempted by the FAA. *Id.* at 470–74. Noting that the FAA's implementing regulations required certain warnings, we held in *Montalvo* that the plaintiffs' state-law failure-to-warn tort theory was preempted, because it would have established through state tort liability a more stringent warning requirement for airlines than that established by federal law. *Id.* In the course of so deciding, *Montalvo*, relying on *Abdullah v. American Airlines, Inc.*, 181 F.3d 363 (3d Cir. 1999), contained some broad language concerning the reach of FAA preemption. *See Montalvo*, 508 F.3d at 473.

---

[13] The Airline Deregulation Act preempts state regulations "related to a price, route, or service" of airlines. 49 U.S.C. § 41713(b)(1).

*Martin* clarified that *Montalvo* should not be read as expansively holding "that the FAA preempts *all* state law personal injury claims." *Martin*, 555 F.3d at 810. Rather, *Martin* held that where there are "'pervasive regulations' in an area, like passenger warnings, the FAA preempts all state law claims in *that* area." *Id.* at 811. "In areas without pervasive regulations or other grounds for preemption," however, "the state standard of care remains applicable." *Id.* In so concluding, *Martin* relied in part on the FAA non-preemption and insurance provisions quoted earlier; in part on a second aspect of *Montalvo*, remanding for further consideration other tort claims that would have been preempted had the FAA preempted all airline-related personal injury claims; and in part on the observation that the *Charas* holding could not coexist with a holding that all airline-safety related state tort claims are preempted. *See id.* at 808, 809–11.

Applying its nuanced standard, *Martin* held that the FAA did not preempt a state tort lawsuit involving aircraft stairs because, in contrast to the lengthy list of federal regulations on passenger warnings, "the only [federal] regulation on airstairs is that they can't be designed in a way that might block the emergency exits." *Id.* at 812. That stray regulation, we held, was not enough to deem aircraft stairs "pervasively regulated." *Id.* at 811.

As noted in *Martin*, the Third Circuit has taken a slightly different approach to FAA field preemption. *See id.* The Third Circuit's leading FAA field preemption case, *Abdullah*, 181 F.3d 363, held that "federal law establishes the applicable *standards of care* in the field of air safety," but does not preempt state *remedies. Id.* at 367 (emphasis added). In so holding, *Abdullah* followed the Supreme Court's reasoning in *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984), which

established, in the context of atomic energy regulation, that "[f]ederal preemption of [state and territorial] standards of care can coexist with state and territorial tort remedies." *Abdullah*, 181 F.3d at 375.

In our own FAA preemption cases, we have cited *Abdullah* approvingly, *see Montalvo*, 508 F.3d at 473, and neutrally, *see Martin*, 555 F.3d at 809, 811. We have also adopted *Abdullah*'s holding "that federal law generally establishes the applicable standards of care in the field of aviation *safety*." *Montalvo*, 508 F.3d at 468 (emphasis added). But we have not adopted *Abdullah*'s implicit distinction between safety and other airline regulations, elaborated in *Elassaad v. Independence Air, Inc.*, 613 F.3d 119 (3d Cir. 2010). The FAA governs not only aviation safety, but also aviation commerce. The breadth of the FAA is relevant in this case, because the ACAA — which is codified under the "economic regulation," not the "safety," subpart of the FAA; *see* 49 U.S.C. subt. VII, pt. A, subt. II — is an antidiscrimination imperative, not a safety regulation.[14]

Nor, before now, have we clearly indicated whether we would follow *Abdullah*'s distinction between the FAA's preemptive effect upon standards of care and remedies — i.e., whether we would agree that it may sometimes be possible for state remedies to survive FAA preemption even where the state standard of care has been preempted. Neither *Montalvo*

---

[14] This is not, of course, to imply that airlines' compliance with the ACAA does not also have safety implications for passengers with disabilities, only that the ACAA is not designed primarily to regulate the safe operation of aircraft. Rather, it is designed primarily to regulate airlines' interactions with their customers who have disabilities. On this point, see generally *Elassaad*, 613 F.3d at 131–32.

nor *Martin* needed to reach this question: In *Montalvo*, the plaintiffs sought to impose a *higher* standard of care than the federal standard, rather than to combine the federal standard of care with state remedies as in *Abdullah*, so their suit was preempted altogether. And *Martin* held that the plaintiff's tort suit was *not* preempted at all, either as to the standard of care or the remedy.[15]

We find persuasive, and here adopt, *Abdullah*'s division of the FAA's field preemptive effect into two components: state standards of care, which may be field-preempted by pervasive regulations, and state remedies, which may survive even if the standard of care is so preempted. As *Abdullah* persuasively reasoned, the Supreme Court has held in other regulatory contexts that "[f]ederal preemption of [state and territorial] standards of care can coexist with state and territorial tort remedies." 181 F.3d at 375 (citing *Silkwood*). Although *Abdullah* relied upon *Silkwood*, an atomic energy case, the same principle emerges from the series of Supreme Court preemption cases arising under the Medical Device Act ("MDA"). In those cases, the Supreme Court has established "that the MDA does not preempt a state-law claim for violating a state-law duty that parallels a federal-law duty under the MDA." *Stengel v. Medtronic Inc.*, 704 F.3d 1224, —, No. 10-17755, slip op. at *9 (9th Cir. Jan. 10, 2013) (en banc) (construing *Medtronic, Inc. v. Lohr*, 518 U.S. 470

---

[15] There are passing indications, however, that *Martin* may have ascribed to *Abdullah*'s distinction. For instance, in construing *Montalvo*, *Martin* states that, "[i]n areas without pervasive regulations or other grounds for preemption, the state *standard of care* remains applicable," *Martin*, 555 F.3d at 811 (emphasis added). This statement would seem to imply that, by contrast, "pervasive regulations or other grounds for preemption" would have a preemptive effect only upon the standard of care and not upon the remedy. *Id.*

(1996), and subsequent cases). The MDA cases are not precisely on point with those applying the FAA; unlike the FAA, the MDA contains an express preemption provision specifying that states may not impose requirements "different from, or in addition to," the MDA's requirements for medical devices. 21 U.S.C. § 360k(a)(1); *see Stengel*, slip op. at *8–9. However, these cases do proceed from the general premise that states may "'provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements,'" *Stengel*, slip op. at *9–10 (quoting *Lohr*, 518 U.S. at 495), absent any express or implied congressional indication otherwise in the statutory scheme at issue. Here, not only is there no adverse indication, but the FAA sections expressly preserving state *remedies* and requiring insurance coverage support the conclusion that state law damages actions remain available even when state substantive standards are displaced. We therefore so hold.

In sum, then, our cases culminating in *Martin*, combined with the division between standards of care and remedies discussed above, establish a two-part framework for evaluating field preemption under the FAA. First, we ask whether the particular area of aviation commerce and safety implicated by the lawsuit is governed by "pervasive [federal] regulations." *See Martin*, 555 F.3d at 811. If so, then any applicable state standards of care are preempted. Even in those areas, however, the scope of field preemption extends only to the standard of care. "Local law still govern[s] the other negligence elements (breach, causation, and damages), as well as the choice and availability of remedies." *Elassaad*,

613 F.3d at 125 (construing *Abdullah*).**[16]** And because the ACAA is an amendment to the FAA and includes no indication that it should be treated independently for preemption purposes, we apply that framework here.

Applying that framework, then, we first look to the area of aviation commerce and safety at issue in this case — assistance for passengers with disabilities — and determine whether, and in what respects, it is pervasively regulated. Taking Gilstrap's allegations as true and in the light most favorable to her, as we are required to do given the procedural posture, her claims concern two aspects of the service provided by United. First, United did not provide the assistance that Gilstrap requested for moving through the airports. Second, United agents were hostile to Gilstrap throughout her travels. We consider the ACAA regulations' preemptive effect, if any, upon each theory of liability in turn.**[17]**

First, as to assistance in moving through the airport: The ACAA regulations are pervasive as to *when* and *where* air carriers must provide such assistance. The regulations spell out in detail that air carriers must provide assistance when a passenger with a disability requests it for moving "between gates to make a connection to another flight," 14 C.F.R.

---

**[16]** We cite *Elassaad* here only for its helpful restatement of the Third Circuit's *Abdullah* holding. In *Elassaad*, the Third Circuit also considered the question of ACAA preemption but, as noted earlier, we do not fully adopt *Elassaad*'s analysis on that question.

**[17]** Again, Gilstrap's first set of flights took place in August 2008, under the 1990 regulations, while her second set of flights took place in December 2009, after the 2009 regulations became effective. As noted, the difference is not material, at least at this stage of the litigation.

§ 382.91(a); "moving from the terminal entrance (or a vehicle drop-off point adjacent to the entrance) through the airport to the gate for a departing flight, or from the gate to the terminal entrance (or a vehicle pick-up point adjacent to the entrance after arriving flight)," including "accessing key functional areas of the terminal, such as ticket counters and baggage claim," *id.* § 382.91(b); and for "enplaning and deplaning," *id.* § 382.95(a). "This assistance must include, as needed, the services of personnel and the use of ground wheelchairs, accessible motorized carts, boarding wheelchairs, and/or on-board wheelchairs . . . , and ramps or mechanical lifts." *Id.*[18]

Gilstrap's negligence and breach-of-duty-of-a-common-carrier claims challenge United's failure to provide her with assistance at all in traversing the air terminal before, between, and after flights. The ACAA and its implementing regulations establish the standard of care — or duty — that United owed to Gilstrap regarding that activity, and so preempt any different or higher standard of care that may exist under California tort law.

But Gilstrap may still rely on California tort law to prove the other elements of her claims — breach, causation, damages, and remedies. In other words, if the evidence at trial shows that United provided Gilstrap with all the assistance required under the ACAA and its implementing regulations, then United cannot be held liable under state law for failing to do anything further. If the evidence at trial shows that United fell short of compliance with the ACAA and its

---

[18] Similarly, but in less detail, the 1990 regulations required air carriers to provide such assistance when a passenger with a disability requested it for "enplaning and deplaning" as well as for "making flight connections and transportation between gates." 14 C.F.R. § 382.39 (2008).

implementing regulations, then whether Gilstrap may recover for any injuries that she may be able to prove were caused by United's breach will depend upon the degree to which California tort law recognizes the ACAA standard of care as applicable in negligence and common carrier claims premised on duties to disabled passengers.

Second, Gilstrap alleges that United agents were repeatedly hostile to her throughout her travels. To the extent that Gilstrap challenges the manner in which United agents responded to her requests for assistance, as in her negligent infliction of emotional distress and intentional infliction of emotional distress claims, field preemption is not implicated. The ACAA regulations say nothing about *how* airline agents should interact with passengers.[19] Whether Gilstrap's complaint makes out a prima facie case of either negligent or intentional infliction of emotional distress under California law is, of course, a separate matter.

Because the district court held Gilstrap's claims entirely preempted, it did not determine whether the California causes of action would survive under California tort law, incorporating the ACAA standards as to negligence and duty of common carriers but not as to negligent and intentional infliction of emotional distress. We leave those issues to be determined in the first instance on remand.

---

[19] The regulations do require that airlines train employees in appropriate responses to passengers with disabilities, *see, e.g.*, 14 C.F.R. § 382.141(a), but, at least at this juncture, Gilstrap's theory of liability is not that the airline failed to train the employees whom she encountered.

### 2. Conflict preemption

Even if state remedies are not field-preempted by the ACAA, they may still be barred if they would create an "actual[] conflict[]" between state and federal law. *Cipollone*, 505 U.S. at 516. Conflict preemption occurs when "it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (citation and internal quotation marks omitted).

It is certainly not impossible for an airline both to comply with federal regulations and to pay damages in state tort suits. The question is whether allowing state tort remedies would pose an obstacle to the achievement of the ACAA's objectives. United argues, and the district court agreed, that Gilstrap's claims are conflict-preempted because Congress did not provide a private cause of action to enforce the ACAA. Therefore, United argues, and the district court concluded, allowing state tort litigation against airlines would pose an obstacle to Congress's objective of making the FAA administrative enforcement scheme the exclusive remedy for ACAA violations.

We need not, and do not, reach here the question of whether the ACAA provides a private cause of action because, as a general matter, we do not agree that conflict-preemption analysis turns on whether a statute provides a federal cause of action. That Congress has not chosen to provide a federal cause of action to enforce a statute does not necessarily mean that all conceivably related state personal-injury claims are displaced.

The district court relied on *Aetna Health Inc. v. Davila*, 542 U.S. 200 (2004), to connect the absence of a federal cause of action to conflict preemption of state remedies. *Davila*, however, interpreted the Employee Retirement Income Security Act. That statute expresses "clear congressional intent to make [its] remedy exclusive," *Davila*, 542 U.S. at 209, and so is not an apt comparison to the FAA statutory scheme, which, as noted, states precisely the opposite — that "[a] remedy under this part is in addition to any other remedies provided by law," 49 U.S.C. § 40120(c). The determination whether state remedies conflict with the objectives of a federal enforcement scheme must always be tailored to the specific statutory and regulatory context at issue.

Two Supreme Court cases, read together, provide some guidance in identifying the federal regulatory schemes with which state tort remedies would necessarily impermissibly conflict: *Silkwood*, 464 U.S. 238, and *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001). *Silkwood* considered the preemptive effect of federal nuclear safety regulations, holding that the federal government had preempted the field of nuclear safety with respect to the substantive *standard of care*. But *Silkwood* added that state *remedies* are foreclosed only if "there is an irreconcilable conflict between the federal and state [liability] standards or . . . the imposition of a state standard in a damages action would frustrate the objectives of the federal law." *See* 464 U.S. at 256. In *Silkwood*, there was no such conflict: Congress's stated purpose was to promote atomic energy only "to the extent it is consistent with the health and safety of the public." *Id.* at 257 (internal quotation marks omitted). Awarding state damages for plaintiffs injured through nuclear development would not frustrate that cabined purpose. *Id.*

*Buckman*, by contrast, did find a conflict between federal regulations and any state tort liability, where the tort claim at issue was uniquely dependent on the federal regulatory regime. Alleging that a regulatory consulting company had defrauded the Federal Drug Administration ("FDA") in the course of obtaining pre-market approval for its client's medical device, the *Buckman* plaintiffs brought a state-law "fraud-on-the-FDA" claim. 531 U.S. at 343–44, 347.

The *Buckman* Court distinguished *Silkwood* in two ways. First, the state claims in *Silkwood* were based "on traditional state tort law principles." *Buckman*, 531 U.S. at 352. In contrast, the very "existence" of the relevant federal enactments was "a critical element" of the *Buckman* plaintiffs' fraud-on-the-agency claim. *Id.* at 353; *see also Stengel*, slip op. at *24 (Watford, J., concurring) ("Central to the Court's reasoning in *Buckman* was that the state law claim asserted there 'exist[ed] *solely* by virtue' of the federal enactments[.]" (quoting *Buckman*, 531 U.S. at 353 (first alteration and emphasis in original))). Second, the federal statute at issue in *Silkwood* provided "specific statutory evidence" that Congress did not intend to preclude state-law remedies. *Buckman*, 531 U.S. at 352. The federal statute at issue in *Buckman*, however, provided "clear evidence that Congress intended that [it] be enforced exclusively by the Federal Government." *Id.* (citing 21 U.S.C. § 337(a)).

Applying these distinctions, our case is considerably closer to *Silkwood* than to *Buckman*, on both fronts. First, here as in *Silkwood*, the plaintiff's claims rely on traditional state tort law. Under California law, proving that United violated the ACAA regulations may help Gilstrap to establish certain rebuttable presumptions regarding the scope of an airline's duty to individuals in Gilstrap's circumstances. But

if the ACAA and its implementing regulations did not exist, she could still have alleged the same claims, albeit with state law supplying the entirety of the applicable standard of care. The existence of the ACAA is not a critical element of Gilstrap's claims in the way that the existence of the FDA is a logical *sine qua non* of a fraud-on-the-FDA claim.

Second, here as in *Silkwood*, there is statutory evidence that Congress did not intend to achieve the objectives of the ACAA through methods that would preclude personal-injury suits. The FAA's savings clause and its liability insurance requirement, both of which cover the ACAA, suggest that Congress did not intend any of the FAA administrative enforcement schemes to be exclusive of state-law *remedies*. While a savings clause is not a *per se* bar to conflict preemption, *see Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869 (2000), the FAA's longstanding savings clause and its liability insurance requirement for air carriers, taken together, express a congressional intent not to preempt state tort remedies in the fields of aviation operation covered by the statutory scheme.

Finally, we note one additional distinction between *Buckman* and our case: The FDA itself is "amply empower[ed] . . . to punish and deter fraud." *Buckman*, 531 U.S. at 348. By pressing a "fraud-on-the-FDA" claim, then, the *Buckman* plaintiffs were superimposing their own efforts on top of the FDA's own fraud deterrence efforts. As a result, "complying with the FDA's detailed regulatory regime in the shadow of 50 States' tort regimes [would] dramatically increase the burdens facing potential applicants" for FDA approval. *Id.* at 350. By contrast, Gilstrap's claims would not duplicate or interfere with the relevant agency's own enforcement procedures. The FAA administrative

enforcement scheme provides only for the investigation of ACAA violations *per se* and civil fines against the airlines, paid to the DOT; it does not provide any mechanism for resolving or compensating individual personal-injury claims. Nor would state damages liability premised in part on ACAA violations increase the burdens facing airlines, as they already must plan for and comply with state tort law for negligence in the operation of airlines. "Like contract principles, the standard of ordinary care is a general background rule against which all individuals order their affairs." *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 236–37 (Stevens, J., concurring in part and dissenting in part).

### 3. Conclusion

In sum, we hold, first, that the ACAA and its implementing regulations preempt state and territorial *standards of care* with respect to the circumstances under which airlines must provide assistance to passengers with disabilities in moving through the airport. The ACAA does not, however, preempt any state *remedies* that may be available when airlines violate those standards. For instance — but only insofar as state law allows it — tort plaintiffs may incorporate the ACAA regulations as describing the duty element of negligence, and rely on state law for "the other negligence elements (breach, causation, and damages), as well as the choice and availability of remedies." *Elassaad*, 613 F.3d at 125 (construing *Abdullah*). Second, we hold that the ACAA and its implementing regulations do not preempt state-law personal-injury claims involving *how* airline agents interact with passengers with disabilities who request assistance in moving through the airport.

At this early stage of the litigation, we are limited to the face of the complaint. There is no record evidence of the severity of Gilstrap's injuries. Taking the complaint as true and in the light most favorable to Gilstrap, her most serious injury was pain, and much of the alleged injury was due to insensitive treatment. We do not know whether a court applying California law will hold that state law provides a tort remedy for such largely dignitary injuries, rooted in important, but statutorily grounded, anti-discrimination norms.

We note, however, that the likely availability of a state tort remedy may be more evident in other circumstances. In *Elassaad*, for instance, a passenger with an amputated leg fell and suffered "severe injuries, including torn cartilage in his shoulder that required surgical repair," when flight attendants did not provide him the necessary assistance deplaning. *Id.* at 122. Reading the ACAA in light of the FAA's savings clause and liability insurance requirement, we cannot conclude that Congress intended to strip such passengers of available state remedies for their injuries. As Justice Stevens observed when construing another FAA-amending statute, "[s]urely Congress did not intend to give airlines free rein to commit negligent acts subject only to the supervision of the Department of Transportation, any more than it meant to allow airlines to breach contracts with impunity." *Wolens*, 513 U.S. at 237 (Stevens, J., dissenting in part and concurring in part).

## B.  Gilstrap's ADA claim

The district court dismissed Gilstrap's ADA claim on the ground that airport terminals are not "places of public accommodation" under Title III of the ADA. In evaluating whether dismissal of Gilstrap's ADA claim was proper, we

begin with the text of Title III, which prohibits discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). The statutory definition of "public accommodation" includes "a terminal, depot, or other station *used for specified public transportation*." *Id.* 12181(7)(G) (emphasis added). "Specified public transportation" is, in turn, defined as "transportation by bus, rail, or any other conveyance (*other than by aircraft*)." *Id.* § 12181(10) (emphasis added).

Fitting these statutory pieces together, the result is that "a terminal . . . used for . . . transportation" "by aircraft" is excluded from definition as a Title III-covered "place of public accommodation." *Accord Lopez v. Jet Blue Airways*, 662 F.3d 593, 599 (2d Cir. 2011); *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1332 (11th Cir. 2004). The statute is unambiguous on this point, so we need not turn to agency interpretations for clarification. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984) ("If the intent of Congress is clear, that is the end of the matter[.]"). We note, however, that our reading of the statute is confirmed by the complementary regulatory frameworks established by the DOJ, which implements the ADA, and the DOT, which implements the ACAA. The DOJ's ADA-implementing regulations state that "[t]he operations of any portion of any airport that are under the control of an air carrier are covered by the Air Carrier Access Act," not the ADA. 28 C.F.R. § 36 app. C. Similarly, the

DOT's ACAA-implementing regulations provide that air carriers are "deemed to comply" with their ACAA obligation to make air terminals accessible

> if the facilities meet requirements applying to places of public accommodation under Department of Justice (DOJ) regulations implementing Title III of the Americans with Disabilities Act (ADA).

14 C.F.R. § 382.51(a)(1). There would be no need for the DOT to incorporate the DOJ's Title III regulations by reference here if Title III already applied to air terminals directly.

Therefore, Gilstrap's ADA claim was properly dismissed. In so holding, we need not decide the extent of the ADA's applicability in airports generally. Title III of the ADA applies to many types of public accommodations, including restaurants and stores. *See* 42 U.S.C. § 12181(7). There is no indication in the statute — and United does not argue — that a restaurant or other non-air-carrier-affiliated facility located within an airport would not be covered by Title III. Nor need we decide here whether an air carrier might be liable under the ADA if it owned, leased, or operated a public accommodation other than an airport terminal. *See Lopez*, 662 F.3d at 599 n.8.

## IV. CONCLUSION

For the reasons above, we affirm the district court's dismissal of Gilstrap's ADA claim. We reverse the district court's dismissal of Gilstrap's state-law claims and remand to the district court for further proceedings on those claims

consistent with this opinion. The district court evaluated only whether the state-law claims were preempted. We, therefore, express no opinion on whether Gilstrap's state-law claims would survive dismissal on other grounds.

**AFFIRMED in part; REVERSED and REMANDED in part. Parties to bear their own costs on appeal.**