**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| NATIONAL FEDERATION OF THE BLIND, on behalf of its members and itself; MICHAEL MAY; MICHAEL HINGSON; CHRISTINA THOMAS, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs-Appellants*,<br><br>v.<br><br>UNITED AIRLINES INC.,<br>*Defendant-Appellee*. | No. 11-16240<br><br>D.C. No.<br>3:10-cv-04816-WHA<br><br><br>OPINION |

Appeal from the United States District Court
for the Northern District of California
William Alsup, District Judge, Presiding

Argued November 8, 2012
Submitted January 19, 2016
San Francisco, California

Filed January 19, 2016

Before: Andrew J. Kleinfeld and Marsha S. Berzon, Circuit
Judges, and Roger T. Benitez, District Judge.[*]

---

[*] The Honorable Roger T. Benitez, District Judge for the U.S. District
Court for the Southern District of California, sitting by designation.

Opinion by Judge Berzon;
Concurrence by Judge Kleinfeld

## SUMMARY[**]

### Federal Preemption

The panel affirmed the district court's dismissal of a class action lawsuit brought by the National Federation of the Blind against United Airlines alleging that the airline's policy of using automatic kiosks inaccessible to blind travelers violated California's antidiscrimination laws.

The panel held that the Federation's state-law claims were not expressly preempted under the ADA. Specifically, the panel held that United's kiosks did not qualify as a "service" within the meaning of the Airline Deregulation Act ("ADA") § 41713(b)(1). The panel further held that its holding was consistent with the ADA's deregulatory purpose.

The panel held that the Federation's state-law claims were impliedly field preempted by the Air Carrier Access Act of 1986 ("ACAA") and 14 C.F.R. § 382.57. Specifically, the panel rejected the Federation's contention that its state-law claims could not be impliedly field preempted under the ACAA because of the combined effects of the Federal Aviation Act's savings clause and the express preemption clause of the ADA. The panel concluded that the U.S. Department of Transportation ACAA regulations covering

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

matters other than the use of airline ticketing kiosks were not pertinent to the field preemption inquiry; that the new regulation (passed after oral argument in this case, 14 C.F.R. § 382.57 (2014)) was pervasive and intended to occupy the field of kiosk accessibility; and that the Department of Transportation acted within its delegated authority in promulgating the new regulation.

Judge Kleinfeld joined in Part II of the majority opinion, and concurred in the result. Judge Kleinfeld did not join Part I of the Opinion, concerning express preemption under the ADA, because Part II, addressing implied preemption of the field, entirely controlled the outcome of the case.

## COUNSEL

Gregory P. Care (argued) and Daniel F. Goldstein, Brown Goldstein & Levy, Baltimore, Maryland; Kevin Knestrick and Laurence W. Paradis, Disability Rights Advocates, Berkeley, California, for Plaintiffs-Appellants.

Jonathan E. Nuechterlein (argued), Bruce H. Rabinovitz, Eric F. Citron, and Eric Paul Winke, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C.; Richard G. Grotch, Coddington, Hicks & Danforth, Redwood City, California, for Defendant-Appellee.

Christine N. Kohl (argued), Douglas N. Letter, Abby C. Wright and Michael S. Raab, and Tony West and Stuart F. Delery, Assistant Attorneys General, United States Department of Justice, Civil Division, Washington, D.C.; Joy K. Park, Peter J. Plocki, Deputy Assistant General Counsel for Litigation, Paul M. Geier, Assistant General Counsel for

Litigation, and Kathryn B. Thomson and Roberty S. Rivkin, General Counsel, United States Department of Transportation, Office of the General Counsel, Washington, D.C., for Amicus Curiae United States.

Robert S. Span, Steinbrecher & Span LLP, Los Angeles, California, for Amicus Curiae Air Transport Association of America, Inc.

## OPINION

BERZON, Circuit Judge:

This case requires us to consider once more the circumstances under which claims brought under state law are preempted by federal statutes governing air transportation. *See, e.g.*, *Gilstrap v. United Air Lines, Inc.*, 709 F.3d 995 (9th Cir. 2013); *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259 (9th Cir. 1998) (en banc).

Plaintiff-Appellants the National Federation of the Blind[1] and three blind individuals, Michael May, Michael Hingson, and Christina Thomas — collectively, "the Federation" — filed a class lawsuit against Defendant-Appellee United Airlines, Inc. ("United"), alleging that the airline's policy of using automatic kiosks inaccessible to blind travelers violates California's antidiscrimination laws. The district court dismissed the suit on the grounds that the Federation's claims

---

[1] The National Federation of the Blind is a non-profit advocacy group on behalf of the blind. The majority of its 50,000 members are blind persons, a protected class under California disability anti-discrimination law. *See* Cal. Gov. Code § 12926; Cal. Civ. Code §§ 51, 54.

were expressly preempted under the Airline Deregulation Act of 1978 ("ADA"), 49 U.S.C. § 41713, and impliedly field preempted under the Air Carrier Access Act of 1986 ("ACAA"), 49 U.S.C. § 41705, and its implementing regulations, issued by the U.S. Department of Transportation ("DOT"). We affirm the district court on the basis of a regulation promulgated after its decision.

## BACKGROUND

United owns and operates over 100 automatic ticketing kiosks in airports throughout California. These kiosks allow passengers to perform various functions relevant to their air travel, including accessing flight information, checking in for flights, printing boarding passes, checking baggage, and selecting and upgrading seats. As now configured, the kiosks require user responses to visual prompts on a computer touchscreen and so cannot be used without assistance by blind travelers. Although United could make its kiosks accessible to blind passengers using commercially available technologies such as audio interfaces and tactile keyboards, it has not.[2] As a result, blind passengers seeking to use United's ticketing kiosks must either rely on the help of sighted relatives, friends, or strangers, or wait for a United agent to assist them. According to the Federation, United thereby "excludes the blind from full and equal access" to its kiosks.

---

[2] Automatic Teller Machines ("ATMs") are required to be equipped with such technologies. *See* 2010 Americans with Disabilities Act Standards for Accessible Design, § 707, *available at* http://www.ada.gov/regs2010/2010ADAStandards/2010ADAstandards.htm#pgfId-1006537.

The Federation sued United, seeking declaratory and injunctive relief as well as damages. Its complaint asserted that United's policy of using kiosks inaccessible to the blind violates two California antidiscrimination statutes: the Unruh Civil Rights Act ("Unruh Act") and the Disabled Persons Act ("DPA"). Cal. Civ. Code §§ 51, 54. The Unruh Act provides that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their . . . disability . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." *Id.* § 51(b). The DPA guarantees persons with disabilities, including the blind, "full and equal access . . . to accommodations, advantages, facilities, . . . and privileges of all common carriers, airplanes, . . . or any other . . . modes of transportation." *Id.* § 54.1(a)(1). These statutes, the Federation argues, require United to "take the steps necessary to make its [k]iosks readily accessible to and usable by blind individuals."**[3]**

United moved to dismiss the Federation's claims on three preemption grounds: (1) that the claims were preempted under the ADA's express preemption provision, 49 U.S.C. § 41713(b)(1); (2) that the claims were impliedly preempted by the ACAA and its implementing regulations, including in particular an "interim" regulation governing kiosk accessibility, *see* Nondiscrimination on the Basis of Disability in Air Travel, 73 Fed. Reg. 27,614, 27,619 (May 13, 2008), which, according to United, pervasively regulated airport kiosk accessibility; and (3) that the Federation's claims were impliedly preempted by the ACAA because they

---

**[3]** There are no California cases or regulations specifically addressing whether California law does so require.

conflicted with the policy objectives reflected in the implementing regulations.[4]

After United filed its motion to dismiss, the district court requested the input of the United States and the DOT.  The United States filed a Statement of Interest maintaining that the Federation's claims were preempted for all of the reasons cited by United.  The district court subsequently issued an order granting United's motion to dismiss, holding the Federation's claims expressly preempted under the ADA and impliedly field preempted under the ACAA.  This appeal followed.

The United States filed an amicus brief with this court, repeating its position that asserted state law claims are preempted.  After oral argument, we vacated submission pending the Supreme Court's resolution of *Northwest, Inc. v. Ginsberg*, 134 S. Ct. 1422 (2014).  While that case was pending, the DOT replaced the interim kiosk regulation with an extensive final rule.  *See* Nondiscrimination on the Basis of Disability in Air Travel: Accessibility of Web Sites and Automated Kiosks at U.S. Airports, 78 Fed. Reg. 67,882 (Nov. 12, 2013).  We ordered supplemental briefing on both developments, and the United States submitted an additional amicus brief, again maintaining that the claims are preempted.

## DISCUSSION

Federal law may preempt state law in three ways.  First, "Congress may withdraw specified powers from the States by

---

[4] United also argued that the Federation's complaint failed to state a claim under California law.

enacting a statute containing an express preemption provision." *Arizona v. United States*, 132 S. Ct. 2492, 2500–01 (2012). Second, "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Id.* at 2501. Finally, "state laws are preempted when they conflict with federal law," such that "compliance with both federal and state regulations is a physical impossibility, . . . [or] the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotation marks and citation omitted).

Regardless of the type of preemption involved — express, field, or conflict — "[t]he purpose of Congress is the ultimate touchstone of pre-emption analysis." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (alteration in original) (internal quotation marks omitted). In this regard, "we are mindful of the adage that Congress does not cavalierly preempt state law causes of action." *Montalvo v. Spirit Airlines*, 508 F.3d 464, 471 (9th Cir. 2007) (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). At the same time, we have recognized that "preemptive intent is more readily inferred" in the field of aviation, because it is "an area of the law where the federal interest is dominant." *Id.* (citing *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982)).

In applying these principles to this case, our inquiry is a cabined one. The Federation's claims were brought pursuant to California's general antidiscrimination statutes. There is no California case law concerning the application of those statutes to airport kiosks. So we do not know at this point to what extent California law requires accessible kiosks or

alternatives thereto.  The issue at this juncture is thus whether *any* accessibility requirement for airport kiosks not required by the DOT regulations would be preempted.

With these background principles and caveats in mind, we consider whether the Federation's claims are foreclosed by any of the three types of preemption.

## I.  Express Preemption under the Airline Deregulation Act ("ADA")[5]

### A.  Statutory Background

---

[5] We reach the express preemption question because it was a basis for the district court's decision and was one of the primary arguments raised on appeal.  It was that issue that prompted us to vacate submission pending the Supreme Court's resolution of *Northwest, Inc. v. Ginsberg*, 134 S. Ct. 1422 (2014).  We then directed the parties to file supplemental briefs addressing the effect on this appeal of the construction of the express preemption clause of the Airline Deregulation Act adopted in *Northwest*.   Had we reached the opposite conclusion—that the Federation's claims *were* expressly preempted under the ADA—that conclusion would have been dispositive, as it would have rendered it unnecessary to proceed to the issue of implied preemption under the Air Carrier Access Act.  A decision that a hotly contested, potentially dispositive issue is *not* dispositive, and a reasoned explanation as to why, is one function of a considered and informative judicial decision.  Whether such an issue is properly discussed (that is, not "dicta") should not depend on which way the court decides it.  *See, e.g.*, *United States v. Ingham*, 486 F.3d 1068, 1078 n.8 (9th Cir. 2007).

According to the concurring opinion, Part I should be disregarded as non-precedential dicta.  For the reasons we have given, we do not believe that is so.  In the end, however, the degree to which Part I has precedential force in a particular future case will be for the future court to decide.  *See, e.g.*, *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1173 (9th Cir. 2004) (analyzing whether statements in an earlier Ninth Circuit opinion were precedential or "nonbinding dicta").

ADA § 41713(b)(1) provides that "a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart." 49 U.S.C. § 41713(b)(1) (previously codified at 49 U.S.C. App. § 1305(a)(1)). It is this provision upon which United relies for its express preemption argument.

In determining the scope of § 41713(b)(1), we "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Charas*, 160 F.3d at 1265 (quoting *Medtronic*, 518 U.S. at 485). To help determine Congress's "manifest purpose," we turn to the ADA's history.

Before 1978, the Civil Aeronautics Board regulated interstate air transportation pursuant to the Federal Aviation Act of 1958 ("FAA"), Pub. L. No. 85-726, 72 Stat. 731 (1958), *as amended*, 49 U.S.C. App. § 1301 *et seq. See Northwest*, 134 S. Ct. at 1428. The FAA did not expressly preempt state regulation. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992). Moreover, the FAA contained a "saving clause," which provided that "[n]othing . . . in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." 49 U.S.C. App. § 1506 (1976) (recodified at 49 U.S.C. § 40120(c));[6] *see also Morales*, 504 U.S. at 378. Thus, under the original statutory regime, states "were not prevented from

---

[6] The saving clause currently reads as follows: "A remedy under this part is in addition to any other remedies provided by law." 49 U.S.C. § 40120(c).

enforcing their own laws, despite the economic effect on the airlines." *Charas*, 160 F.3d at 1262.

In 1978, Congress, concluding that "efficiency, low prices, variety, and quality would be furthered by reliance on competitive market forces rather than pervasive federal regulation," enacted the ADA as an amendment to the FAA. *Id.* (citing H.R. Conf. Rep. No. 95-1779, 95th Cong., 2d Sess. 53 (1978)). "Congress's 'clear and manifest purpose' . . . was to achieve . . . the economic deregulation of the airline industry . . . [and] 'to promote maximum reliance on competitive market forces.'" *Id.* at 1265 (quoting *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 230 (1995)) (internal quotation marks omitted). To prevent the states from "undo[ing] federal deregulation with regulation of their own," *Northwest*, 134 S. Ct. at 1428 (quoting *Morales*, 504 U.S. at 378) (internal quotation marks omitted), Congress included § 41713(b)(1) to expressly preempt state laws "related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1).[7]

---

[7] This clause was originally located at 49 U.S.C. App. § 1305(a)(1) and preempted state laws "relating to [air carrier] rates, routes, or services." In 1994, § 1305(a)(1) was amended and incorporated into the Federal Aviation Administration Authorization Act of 1994 to prohibit the enactment or enforcement of state laws "related to *price*, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1) (emphasis added). Congress intended this amendment "to make no substantive change." *Wolens*, 513 U.S. at 238 n.1 (citing Pub. L. No. 103-272, § 1(a), 108 Stat. 745 (1994)).

## B. United's Kiosks Are Not "Services" under the ADA

The express preemption question in this case is whether the Federation's state law claims are "related to" United's "prices, routes, or services." United contends that its kiosks are a "service" as that term is used in the ADA, and that the Federation's Unruh Act and DPA claims are "related to a . . . service of an air carrier," rendering them preempted.[8] We disagree.

To begin, under the ADA as we have interpreted it, the term "service" "refer[s] to the prices, schedules, origins and destinations of the point-to-point transportation of passengers, cargo, or mail." *Charas*, 160 F.3d at 1261. "Congress used 'service' in [§ 41713(b)(1)] in the public utility sense — *i.e.*, the provision of air transportation to and from various markets at various times," and did not mean broadly to reach the various amenities provided by airlines, such as "in-flight beverages, personal assistance to passengers, the handling of luggage, and similar amenities." *Id.* at 1266, 1261.

Under our interpretation of § 41713(b)(1), the Federation's claims do not relate to a "service" provided by United. First, kiosks are not "prices, schedules, origins [or] destinations of the point-to-point transportation of passengers, cargo, or mail." *Id.* at 1261. Thus, to the extent they regulate kiosks, California's antidiscrimination statutes regulate an amenity that United has chosen to provide, not "the provision of air transportation." *Id.* at 1266.

---

[8] United does not argue that the Federation's claims relate to United's prices or routes.

Nor is it significant that kiosks facilitate services that relate to air transportation.  As we noted in *Charas*, Congress did not intend "service" to refer to the "assistance to passengers in need, or like functions."  *Id*. at 1266.  While they may be convenient for passengers, kiosks are not "services" in the "public utility sense."  *See id.*

Finally, *Charas*'s analysis of the term "service" is equally applicable to discrimination claims, so that a claim concerning the "service" of accommodating disabled passengers (or failing to do so) does not automatically trigger the express preemption provision.  *See Newman v. Am. Airlines, Inc.*, 176 F.3d 1128, 1131 (9th Cir. 1999).   In *Newman*, a blind passenger suffering from cancer and a heart condition was denied passage on the airline until she could provide a certificate from her doctor stating that it was safe for her to fly.  *Id.* at 1130.  The passenger sued the airline, alleging, *inter alia*, discrimination claims under California law.  *Id.*  We held that "[a]s used in a public utility sense, the term 'service' does not refer to alleged discrimination to passengers due to their disabilities."  *Id.* at 1131.  For the same reason, the Federation's accommodation claims do not come within the preemptive scope of § 41713(b)(1).

United and its supporting *amici*, the United States and the Air Transport Association of America ("ATAA"), do not really contest that, under *Charas*, the conclusion that the kiosks do not provide a "service" within the meaning of the ADA preemption provision is inescapable.  Instead, they dispute *Charas*'s continuing vitality, maintaining that the Supreme Court overruled *Charas* in *Rowe v. New Hampshire Motor Transport Ass'n*, 552 U.S. 364 (2008), by adopting a different and broader definition of "service" than did *Charas*. Not so.

*Rowe*, applying a provision of the Motor Carrier Act modeled after § 41713(b)(1), held preempted a Maine statute that imposed a licensing and recipient-verification regime on retailers seeking to transport tobacco within the state. 552 U.S. at 370. *Rowe* concluded that the Maine statute was sufficiently related to "delivery services" to come within the scope of the Motor Carrier Act's preemption provision. *Id.* at 371–72. *Rowe*'s understanding of the term "service" is entirely consistent with our decision in *Charas*.

Like *Charas*, *Rowe* viewed the term "service" as focused on "essential details of *the carriage itself*." *Id.* at 373 (emphasis added). Far from being aimed at carriers' amenities, the Maine tobacco law at issue in *Rowe* was "aim[ed] directly at the carriage of goods," and "directly regulate[d] a significant aspect of the motor carrier's package pickup and delivery service." *Id.* at 376, 373. Most notably, the law mandated "particular delivery procedures" that affected how and to whom carriers could deliver tobacco. *Id.* at 371. In other words, the Maine law regulated "such things as . . . the selection of markets to or from which transportation is provided." *Charas*, 160 F.3d at 1265–66.

The Supreme Court recently confirmed *Rowe*'s focus on *transportation* services in *Dan's City Used Cars, Inc. v. Pelkey*, 133 S. Ct. 1769, 1779 (2013). In that case, the Court held that claims brought under New Hampshire's abandoned vehicle removal regime were not preempted under the same express preemption provision at issue in *Rowe*. *Id.* The Court again declined to articulate "an all-purposes definition of transportation 'service[s].'" *Id.* (alteration in original). It emphasized, however, that unlike the tobacco delivery restrictions at issue in *Rowe*, New Hampshire's abandoned vehicle laws had no connection to "transportation activities"

— they merely addressed the "storage" of vehicles. *Id.* We conclude that *Rowe* is not inconsistent with *Charas* with respect to the definition of "service."

We are mindful that some circuit courts have articulated broader constructions of the word "service" in ADA § 41713(b)(1) than the one we adopted in *Charas*. *See, e.g.*, *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 336 (5th Cir. 1995) (en banc) (interpreting "services" to include "items such as ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself"); *see also Bower v. Egyptair Airlines Co.*, 731 F.3d 85, 94 (1st Cir. 2013) (noting that the court had adopted the *Hodges* definition of "service"); *Koutsouradis v. Delta Air Lines, Inc.*, 427 F.3d 1339, 1343 (11th Cir. 2005) (same); *Arapahoe Cnty. Pub. Airport Auth. v. F.A.A.*, 242 F.3d 1213, 1222 (10th Cir. 2001) (citing the *Hodges* definition); *Smith v. Comair, Inc.*, 134 F.3d 254, 259 (4th Cir. 1998) (same); *Travel All Over The World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1433 (7th Cir. 1996) (adopting the *Hodges* definition). *But see Taj Mahal Travel, Inc. v. Delta Airlines, Inc.*, 164 F.3d 186, 194 (3d Cir. 1998) (adopting the *Charas* definition of "service").     And in adopting broader interpretations of "service," two Courts of Appeals have suggested that *Rowe* is inconsistent with our *Charas* definition. *See Bower*, 731 F.3d at 94 (citing *DiFiore v. Am. Airlines, Inc.*, 646 F.3d 81, 88 & n.9 (1st Cir. 2011)); *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 223 (2d Cir. 2008).

We disagree with these other courts for the reasons we have explained.   In any event, *Rowe* is certainly not so "clearly irreconcilable" with *Charas* as to allow a three-judge panel to overrule a prior en banc decision of this court. *See*

*Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).  As we said in *Dilts v. Penske Logistics, LLC*: "*Rowe* did not represent a significant shift in [Motor Carrier Act] jurisprudence.  Nor did it call into question our past [Motor Carrier Act] cases."  769 F.3d 637, 645 (9th Cir. 2014).

Nor is *Northwest* inconsistent with *Charas*.  In the course of holding expressly preempted a claim in connection with a frequent flyer program, *Northwest* observed that:

> Like the frequent flyer program in *Wolens*, the Northwest program is connected to the airline's "rates" because the program awards mileage credits that can be redeemed for tickets and upgrades.  *See* [*Wolens*,] 513 U.S.[] at 226.  When miles are used in this way, the rate that a customer pays, *i.e.*, the price of a particular ticket, is either eliminated or reduced.  The program is also connected to "services," *i.e.*, access to flights and to higher service categories.  *Ibid*.

*Northwest*, 134 S. Ct. at 1431.

The relevant portion of *Northwest* was a direct application of *Wolens*, not a shift in the Supreme Court's interpretation of the ADA preemption provision.[9]  Like *Wolens*, *Northwest* addressed a frequent-flyer program.  *Id*.  *Northwest* concluded

---

[9] *Northwest*'s other holdings, that the ADA's express preemption provision may apply to common-law rules, 134 S. Ct. at 1429–30, and that the particular claim for breach of the duty of good faith and fair dealing at issue did not fall within the *Wolens* exception to preemption for contractual claims, *id*. at 1431–33, have no application to this case.

that the program was connected to both rates and services for exactly the same reasons given in *Wolens*. *See id.*; *Wolens*, 513 U.S. at 226. The discussion does not clarify whether aspects of air travel *other than* frequent-flyer programs, such as ticket kiosks, fall within the scope of the preemption clause.

United and the United States argue, however, that *Northwest* "underscores" that "the Supreme Court had *already* superseded this Court's airline 'services' interpretation [in *Charas*] with a controlling classification of its own." But *Wolens* was decided before *Charas*. So, even if *Charas* was wrongly decided, *Wolens* would not give this panel the authority to revisit it. *Miller*, 335 F.3d at 900. And, since the relevant portion of *Northwest* simply applies *Wolens*, it similarly does not give this panel the authority to disregard *Charas*. *Id.* Accordingly, we hold that United's kiosks do not qualify as a "service" within the meaning of ADA § 41713(b)(1).

Moreover, our conclusion, based on *Charas*, that United's kiosks fall outside the statutory definition of "services" is consistent with the ADA's deregulatory purpose. In enacting the ADA, Congress primarily sought to "utilize competition and market forces to achieve regulatory goals, such as low-cost, efficient air transportation." H.R. Rep. No. 95-1779, at 55 (1978) (Conf. Rep.); *see also Charas*, 160 F.3d at 1262–63. But, as *Charas* stated, "[n]othing in the Act itself, or its legislative history, indicates that Congress had a 'clear and manifest purpose' to displace" state laws "that do not affect deregulation in more than a 'peripheral manner.'" *Charas*, 160 F.3d at 1265 (quoting *Morales*, 504 U.S. at 390). Instead, "when Congress enacted *federal* economic deregulation of the airlines, it intended to insulate the

industry from possible *state* economic regulation as well."
*Id.* at 1266.

United does not argue that the Federation's claims, if
accepted, would frustrate the goals of airline deregulation.
Nor has it demonstrated that the claims would have a
significant effect on any of those airline services that are
covered by the ADA preemption provision. *See Montalvo*,
508 F.3d at 475; *Martin ex rel. Heckman v. Midwest Exp.
Holdings, Inc.*, 555 F.3d 806, 810 (9th Cir. 2009).

For all these reasons, the Federation's claims are not
expressly preempted under the ADA.

## II.  Implied Preemption under the Air Carrier Access Act ("ACAA")

### A.  Statutory and Regulatory Background

We recently explained the background of the ACAA:

> The ACAA is an amendment to the
> [FAA].  The original FAA, passed in 1958,
> included a requirement that air carriers not
> "subject any particular person . . . to any
> unjust discrimination or any undue or
> unreasonable prejudice or disadvantage in any
> respect whatsoever." 49 U.S.C. App. § 1374
> (1982), *repealed by* Pub. L. No. 103-272, 108
> Stat. 745, 1141 (1994).  This requirement was
> repealed by the [ADA], leaving passengers
> with disabilities without express protection
> against discrimination by commercial airlines.

 *See Shinault v. Am. Airlines, Inc.*, 936 F.2d 796, 802 (5th Cir. 1991).

A different statute, § 504 of the Rehabilitation Act of 1973[,] provides generally that individuals with disabilities may not be excluded from or discriminated against by federally-funded programs. *See U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 599 (1986). In 1979, the Civil Aeronautics Board . . . promulgated regulations applying § 504 to those commercial airlines that received direct federal subsidies. Organizations representing individuals with disabilities . . . challenged those regulations, seeking to apply § 504 to *all* commercial airlines, on the ground that airlines not receiving direct federal subsidies were indirect recipients of federal funding for airport construction and for the federally operated air traffic control system. The Supreme Court rejected [that] argument[], holding that commercial airlines were . . . not "recipients[]" of federal [financial assistance]. *Id.* at 607, 611.

*Gilstrap*, 709 F.3d at 999 (some alterations in original) (footnote and some citations omitted).

Congress responded to *Paralyzed Veterans* by passing the ACAA as an amendment to the FAA. *Id.* at 1000. The current version of the ACAA provides that "an air carrier . . . may not discriminate against an otherwise qualified individual" on the ground that "the individual has a physical

or mental impairment that substantially limits one or more major life activities." 49 U.S.C. § 41705(a)(1). The Secretary of Transportation is authorized to promulgate regulations implementing the ACAA under § 40113(a) of the FAA, *id.* § 40113(a), and:

> Pursuant to that authorization, the [DOT] issued regulations, codified at 14 C.F.R. Part 382, specifying the detailed requirements that airlines must meet to comply with the ACAA. The regulations impose four general duties on air carriers: "not [to] discriminate against any qualified individual with a disability, by reason of such disability, in the provision of air transportation"; "not [to] require a qualified individual with a disability to accept special services . . . that the individual does not request"; "not [to] exclude a qualified individual with a disability from or deny the person the benefit of any air transportation or related services that are available to other persons," with certain limited exceptions; and "not [to] take any adverse action against an individual (e.g., refusing to provide transportation) because the individual asserts, on his or her own behalf or through or on behalf of others, rights protected" by the regulations or the ACAA. 14 C.F.R. § 382.11(a).

*Gilstrap*, 709 F.3d at 1000–01 (all but first alteration in the original).

## B. Implied Field Preemption

### 1. The Federal Aviation Act's Saving Clause

Before we consider whether the Federation's claims are impliedly field preempted by the ACAA and its implementing regulations, we must first address the Federation's assertion that implied field preemption is "not permitted" under the ACAA. Specifically, the Federation argues that its state-law claims cannot be impliedly field preempted under the ACAA because of the combined effect of the FAA's saving clause and the express preemption clause of the ADA. According to the Federation, any state-law claims that fall outside the scope of the ADA express preemption provision are *necessarily* preserved by the FAA's saving clause. That is not so.

The saving clause provides that "[a] remedy under this part is in addition to any other remedies provided by law." 49 U.S.C. § 40120(c).[10] The clause was enacted as part of the original Federal Aviation Act of 1958; it remained unchanged when Congress enacted the ADA in 1978 and the ACAA in 1986. Congress retained once more the saving clause when it reorganized the FAA in 1994. *See* Revision of Title 49, United States Code Annotated, "Transportation," Pub. L. No. 103-272, 108 Stat. 745 (1994).

The Federation maintains that if Congress had wanted to preempt state discrimination claims, it could have done so explicitly in the ADA express preemption provision,

---

[10] As noted, the ACAA is contained within the same "part" of the FAA, which is Part A of Title 49, Subtitle VII. *See* 49 U.S.C. Subtit. VII, Part A.

49 U.S.C. § 41713(b)(1).  Because Congress did not do so, the Federation's argument goes, "the [FAA] savings clause springs into operation once it is determined that a claim is not expressly preempted . . . [and] preserves those claims from field preemption."

We are unpersuaded, for several reasons.  First, by its terms, the FAA's saving clause preserves only "other *remedies* provided by law," 49 U.S.C. § 40120(c) (emphasis added), not claims brought under state statutes prescribing substantive standards of care.  *See Northwest*, 134 S. Ct. at 1428 (describing § 40120(c) as "a saving provision preserving pre-existing statutory and common-law *remedies*") (emphasis added); *Morales*, 504 U.S. at 385 (describing § 40120(c) as a "general '*remedies*' saving clause") (emphasis added); *Ventress v. Japan Airlines*, 747 F.3d 716, 723 n.7 (9th Cir. 2014) ("The FAA's savings clause . . . establish[es] that state law *remedies* remain available . . . .") (emphasis added); *Gilstrap*, 709 F.3d at 1005–06; *see also US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1326 (10th Cir. 2010).  In this case, the Federation seeks relief under "prescriptive" state statutes that "control[] the primary conduct of those falling within [their] governance."  *Wolens*, 513 U.S. at 227.  It does not, as in *Gilstrap*, seek to use a state-law remedy for a breach of a federally prescribed standard of behavior.  *See Gilstrap*, 709 F.3d at 1007.

The Federation relies on the statement in *Brown v. United Airlines, Inc.*, a First Circuit case, that "when the [ADA] saving clause is juxtaposed with the [ADA express] preemption provision it 'ought properly be read to carve out all common law or statutory claims not related to an airline's prices, routes or services.'"  720 F.3d 60, 69 (1st Cir. 2013) (quoting *Mitchell v. U.S. Airways, Inc.*, 858 F. Supp. 2d 137,

154 (D. Mass. 2012)).  But *Brown* held, in relevant part, only that common-law claims could be preempted by the ADA's express preemption provision, and that the plaintiffs' claims *were* in fact preempted.  *Id*. at 69; 71.  Implied preemption was not at issue in *Brown* at all.  Nor is there any reason to think that *Brown*'s statement that claims not falling within the express clause are carved out by the saving clause was intended to refer to implied preemption.

Moreover, in general, the inclusion of either a saving clause or an express preemption clause within a statutory scheme does not foreclose the application of ordinary implied preemption principles.   "[T]he existence of an 'express pre-emption provisio[n] does not bar the ordinary working of conflict pre-emption principles' or impose a 'special burden' that would make it more difficult to establish the preemption of laws falling outside the clause."  *Arizona*, 132 S. Ct. at 2504-05 (quoting *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869–72 (2000)).  That the Federation's claims are not expressly preempted under the ADA, therefore, does not "categorical[ly] . . . preclude" implied preemption under the ACAA.  *Freightliner Corp. v. Myrick*, 514 U.S. 280, 288 (1995).

The presence of a saving clause does not necessarily limit the operation of ordinary implied preemption principles either.   *Geier* is instructive in this regard.   That case concerned preemption under the National Traffic and Motor Vehicle Safety Act of 1966 ("Safety Act"), 15 U.S.C. § 1381 (1988), *repealed by* Pub. L. No. 103-272, § 7(b), 108 Stat. 1379 (1994).  529 U.S. at 867.  The Safety Act had a saving clause, which provided that "[c]ompliance with' a federal safety standard 'does not exempt any person from any liability under common law."  *Id.* at 868 (quoting 15 U.S.C.

§ 1397(k) (1988)).  *Geier* explained that neither the Safety Act's saving clause nor its express preemption clause[11] "foreclose[d] or limit[ed] the operation of ordinary pre-emption principles insofar as those principles instruct us to read statutes as pre-empting state laws . . . that 'actually conflict' with the statute or federal standards promulgated thereunder."  *Id.* at 869; *see also Williamson v. Mazda Motor of Am., Inc.*, 131 S. Ct. 1131, 1136 (2011) (holding that a statute's saving clause did not "foreclose or limit the operation of ordinary conflict preemption principles").  *Geier* emphasized that the Court "ha[d] repeatedly 'decline[d] to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law.'"  *Id.* at 870 (quoting *United States v. Locke*, 529 U.S. 89, 106 (2000)).

As *Geier* then went on to explain, the presence of *both* a saving clause and an express preemption clause in the Safety Act does not "create some kind of 'special burden' beyond that inherent in ordinary pre-emption principles."  *Id.* at 870. Although the saving and preemption clauses reflected

---

[11] The Safety Act's express preemption clause provided that

> Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment[,] any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard.

15 U.S.C. § 1392(d) (1988), *repealed by* Pub. L. No. 103-272, § 7(b), 108 Stat. 1379 (1994).

seemingly conflicting congressional objectives, *Geier* declined to interpret the Safety Act's saving clause as preserving *all* claims brought under state law that did not fall within the preemption provision's scope, noting that "[t]o the extent that such an interpretation of the saving provision reads into a particular federal law toleration of a conflict that [ordinary conflict preemption] principles would otherwise forbid, it permits that law to defeat its own objectives." *Id.* at 872. Permitting common-law actions that "actually conflict" with federal regulations "would take from those who would enforce a federal law the very ability to achieve the law's congressionally mandated objectives that the Constitution, through the operation of ordinary pre-emption principles, seeks to protect." *Id.*

*Geier* concerned only the operation of ordinary implied *conflict* preemption principles. But the same logic applies to the operation of implied *field* preemption principles. *Compare Arizona*, 132 S. Ct. at 2504-05 (relying on *Geier*) *with id.* at 2520 (Scalia, J., concurring in part and dissenting in part) (arguing that *Geier* was inapplicable because it applied conflict preemption principles, while the majority relied on field preemption). To interpret § 40120(c) as preserving *any* state-law claim not preempted under the ADA — including claims involving areas pervasively regulated by the DOT, such that Congressional intent to "occupy a field exclusively" would otherwise be inferred, *Freightliner*, 514 U.S. at 287 — would allow the FAA to "defeat its own objectives." *Geier*, 529 U.S. at 872. The FAA expressly authorizes the DOT to promulgate "necessary" regulations to carry out the ACAA. 49 U.S.C. §§ 40101, 40113. In fact, it was the need for a "uniform and exclusive system of federal regulation" that led Congress to enact the FAA in the first place. *See Montalvo*, 508 F.3d at 471. Under the

Federation's reading of § 40120(c), however, a passenger could sue an airline for violating *any* state standard of care not expressly preempted by the ADA, notwithstanding federal regulations covering in depth the particular field at issue. The result would be chaotic. A federal regulatory scheme designed to determine entirely the rights and obligations of affected parties as to particular issues could then coexist with another set of comprehensive regulations covering the same area, as long as there was no direct conflict between the two. Yet, comprehensive regulatory schemes often represent considered decisions to refrain from mandating certain actions or protections, while at the same time allowing those same actions or protections if undertaken voluntarily.

There is little reason to think Congress, in retaining the FAA's saving clause, intended to create "such a complex type of state/federal relationship" as would result if two sets of comprehensive schemes of this sort were allowed to coexist. *Geier*, 529 U.S. at 872. Absent any specific indication that Congress sought to preserve all state-law claims not expressly preempted under the ADA, we adopt the *Geier* approach and so apply ordinary implied field preemption principles to the Federation's claims.

### 2.  *The Regulatory Field*

Under those principles, "state law is pre-empted . . . if federal law so thoroughly occupies a legislative field 'as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Cipollone*, 505 U.S. at 516 (quoting *de la Cuesta*, 458 U.S. at 153); *see also Freightliner*, 514 U.S. at 287. In determining field preemption, "[f]ederal regulations have no less pre-emptive effect than federal statutes." *de la Cuesta*, 458 U.S. at 153. Accordingly,

"[w]here . . . Congress has entrusted an agency with the task of promulgating regulations to carry out the purposes of a statute, as part of the preemption analysis we must consider whether the regulations evidence a desire to occupy a field completely." *Montalvo*, 508 F.3d at 470–71 (quoting *R.J. Reynolds Tobacco Co. v. Durham Cnty.*, 479 U.S. 130, 149 (1986)) (alteration in original). In particular, we "look[] to the pervasiveness of federal regulations in the specific area covered by the . . . state law at issue." *Martin*, 555 F.3d at 809; *see also Ventress*, 747 F.3d at 721. If the pervasiveness of the regulations indicate that the agency sought to occupy the field, we ask only "whether that action [wa]s within the scope of the [agency's] delegated authority." *de la Cuesta*, 458 U.S. at 154.

With respect to accessibility of airport kiosks, DOT has promulgated two regulations. First, on May 13, 2008, DOT promulgated an "interim" rule, requiring, without significant further elaboration, that if kiosks are inaccessible, the airline must provide "equivalent service." 14 C.F.R. § 382.57 (2008); *see also* 73 Fed. Reg. at 27,619–20.[12] After oral argument in this case, DOT replaced that brief interim rule with a much more extensive and detailed one, addressing a wide variety of accessibility, technical, and timing requirements specifically applicable to airport kiosks (the "new regulation"). *See* 14 C.F.R. § 382.57 (2014); 78 Fed. Reg. at 67,900–11.

---

[12] The interim rule provided, in its entirety: "As a carrier, if your automated kiosks in airport terminals cannot readily be used by a passenger with a disability for such functions as ticketing and obtaining boarding passes that the kiosks make available to other passengers, you must provide equivalent service to the passenger (*e.g.*, by assistance from your personnel in using the kiosk or allowing the passenger to come to the front of the line at the check-in counter)." 14 C.F.R. § 382.57 (2008).

Applying our precedents concerning field preemption, we conclude, first, that the DOT ACAA regulations covering matters other than the use of airline ticketing kiosks are not pertinent to our field preemption inquiry; second, that the new regulation is pervasive and intended to occupy the field of kiosk accessibility; and, third, that DOT acted within its delegated authority in promulgating the new regulation.

The essential field preemption inquiry is whether the density and detail of federal regulation merits the inference that any state regulation within the same field will necessarily interfere with the federal regulatory scheme. The first step in determining whether that situation exists is to delineate the pertinent regulatory field; the second is to survey the scope of the federal regulation within that field.

In *Martin*, 555 F.3d 806, for example, a pregnant passenger who had fallen on an airplane's stairway, injuring herself and her fetus, alleged that the airstairs were "defectively designed because they had only one handrail." *Id.* at 808. The "only [DOT] regulation on airstairs," we noted, provided that "they can't be designed in way that might block the emergency exits"; the regulation had "nothing to say about handrails, or even stairs at all, except in emergency landings." *Id.* at 812. We concluded that "[b]ecause the agency [had] not comprehensively regulated airstairs, the FAA [had] not preempted state law claims that the stairs are defective." *Id.* In so ruling, we emphasized the importance of delineating the pertinent area of regulation with specificity before proceeding with the field preemption inquiry: "[W]hen [an] agency issues 'pervasive regulations' in an area . . . the [statute] preempts all state law claims in *that* area." *Id.* at 811. But, "[i]n areas without pervasive

regulations . . . the state standard of care remains applicable." *Id.*[13]

The current version of § 382.57 *does* pervasively regulate the accessibility of airport kiosks. That regulation, appended to this opinion, is exhaustive. With regard to blind travelers, the rule specifies, among many other matters, the following technical and design requirements for accessible airport kiosks:

> (1) "Automated airport kiosks must provide an option for speech output," and meet specified requirements concerning the content, volume, and privacy restrictions on that output, *id*. § 382.57(c)(5)(i)–(ii);[14] and (2)

---

[13] As *Gilstrap* explained, while our earlier decision in *Montalvo*, 508 F.3d at 473, had "contained some broad language concerning the reach of FAA preemption[,] . . . *Martin* clarified that *Montalvo* should not be read . . . expansively" with regard to the relevant field for preemption purposes. *Gilstrap*, 709 F.3d at 1004.

[14] With regard to speech output, as for other matters, the current regulation provides an extremely fine-cut level of detail. The regulation provides, for example, that, "[w]hen asterisks or other masking characters are used to represent personal identification numbers or other visual output that is not displayed for security purposes, the masking characters must be spoken ("*" spoken as "asterisk") rather than presented as beep tones or speech representing the concealed information." 14 C.F.R. § 382.57(c)(5)(i)(A). As to the volume of speech output, the regulation instructs:

> Where sound is delivered through speakers on the automated kiosk, incremental volume control must be provided with output amplification up to a level of at least 65 dB SPL. Where the ambient noise level of the environment is above 45 dB SPL, a volume gain of at

> "[a]t least one input control that is tactilely discernible without activation must be provided for each function," and meet specified requirements regarding the arrangement and tactile indication required, *id*. § 382.57(c)(6).[15]

The regulation also requires that the kiosk's "[o]perable parts must be tactilely discernible without activation," *id*. § 382.57(c)(3)(i) and that "Braille instructions for initiating the speech mode must be provided." *Id*. § 382.57(c)(8). Finally, the regulation imposes a backup requirement of "equivalent service," similar to the general accommodation language that appeared in the interim rule. *Id*. § 382.57(d).[16]

---

> least 20 dB above the ambient level must be user selectable. A function must be provided to automatically reset the volume to the default level after every use.

*Id*. § 382.57(c)(5)(ii)(B).

[15] Again demonstrating its extreme precision, the regulation specifies the particular symbols to be used for "function keys": "Enter or Proceed key: raised circle; Clear or Correct key: raised left arrow; Cancel key: raised letter ex; Add Value key: raised plus sign; Decrease Value key: raised minus sign." 14 C.F.R. § 382.57(c)(6)(iv)(B).

[16] "You must provide equivalent service upon request to passengers with a disability who cannot readily use your automated airport kiosks (e.g., by directing a passenger who is blind to an accessible automated kiosk, assisting a passenger in using an inaccessible automated kiosk, assisting a passenger who due to his or her disability cannot use an accessible automated kiosk by allowing the passenger to come to the front of the line at the check-in counter)." *Id*. § 382.57(d).

The new regulation thus informs airlines with striking precision about the attributes their accessible kiosks must have.  In doing so, the new regulation speaks directly to the concerns raised by the Federation's suit.

In its complaint, the Federation alleged that, because United's kiosks "use exclusively visual computer screen prompts and touch-screen navigation to guide a customer through a transaction without translating the prompts into a medium accessible to the blind, such as audio output[,] . . . vision is required to successfully use" the kiosks. Furthermore, the Federation alleged, "[t]echnology exists for United's [k]iosks to be accessible to the blind, including but not limited to an audio interface, a tactile keyboard, and/or interactive screen reader technology for use with touch screens."

The new regulation instructs United *exactly* what it must do to address this problem, from the general — namely that its accessible kiosks must, as the Federation suggests, incorporate both speech output and at least one tactile input method — to the granularly specific, including the specific decibel levels for speech output and the particular tactile symbols to be used.  Thus, "a number of *specific* federal [regulatory provisions] govern" the particular standards at issue here, namely what level of accessability for blind individuals is required for airport kiosks. *Montalvo*, 508 F.3d at 472 (emphasis added).   Further, the regulation is unmistakably pervasive in the pertinent sense, in that it exhaustively regulates the relevant attributes of accessible kiosks.  Given its great detail and pervasive extent, the new regulation preempts any state regulation of that same field. *See id*.

As the Federation notes, the regulation does not require that airlines make such accessible kiosks immediately available.  Rather, the regulation establishes a timeline, gradually increasing the availability of accessible kiosks. First, all kiosks installed on or after December 12, 2016, must meet the accessibility specifications defined by the regulation, until 25% of the kiosks at each location at an airport are accessible.  14 C.F.R. § 382.57(a)(1).  Second, airlines must ensure that at least 25% of kiosks at each location meet the regulation's accessibility specifications by December 12, 2022.  *Id*. § 382.57(a)(2).[17]  In other words, the regulation envisions that 25% of kiosks at each location will be accessible by the end of 2022, and requires in the mean time only that any new kiosks installed after December 12, 2016, be accessible until that 25% goal is reached.

That federal and state regulatory schemes "may require different . . . deadlines" for compliance does not always establish a *conflict* between those schemes. *Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 430 (9th Cir. 2014).  Here, however, DOT has very precisely dictated not only the substance of the accessible kiosk requirement, but also *when* airlines must come into full compliance with those substantive requirements, and what steps the airlines must take in the interim.  The detail concerning timing demonstrates that the

---

[17] Both rules apply only to kiosks at airports with "10,000 or more enplanements per year."  14 C.F.R. § 382.57(a).  The regulation specifies that "location" refers to "each cluster of kiosks and all stand-alone kiosks at the airport."  *Id*. § 382.57(a)(1).  Finally, the regulation imposes these requirements both as to kiosks a particular airline owns, leases, or controls, *id*. § 382.57(a), and as to "shared-use" kiosks that an airline jointly owns, leases, or controls, *id*. § 382.57(b).

regulation is pervasive not only as to *what* standards apply, but also as to *when* compliance is required.

Moreover, DOT carefully calibrated the phase-in period for kiosk accessibility. First, while DOT initially considered a compliance deadline of only 60 days, it ultimately decided that such a short timeline would not be "feasible" given the time that would be required to develop, test, and market new accessible kiosks. 78 Fed. Reg. at 67,907. Second, DOT settled on the ultimate 10-year deadline for airlines to ensure that 25% of kiosks are accessible at every location after considering the average life span of kiosks, indicating that "it is reasonable to conclude that well before the end of the 10-year period after the effective date of this rule virtually all airport kiosks will have reached the end of their life span" and will be replaced with accessible kiosks until the 25% threshold is reached. *Id*. at 67,908. Third, DOT initially raised the possibility of requiring airlines to retrofit existing kiosks as an interim measure, but ultimately rejected the idea as "an expensive, and in some cases, technically infeasible means to accomplish" the "more rapid near-term availability of accessible machines." *Id*. at 67,909.

In this regard, the regulation resembles the airbag standard at issue in *Geier*. Rejecting the view, urged in that case, that DOT had "set[] a minimum airbag standard" but allowed state regulation to accelerate requirements because "the more airbags, and the sooner, the better," *Geier* observed that DOT's view was to the contrary:

> The [DOT's] comments, which accompanied the promulgation of [the rule], make clear that the standard deliberately provided the manufacturer with a range of choices among

different passive restraint devices.  Those
choices would bring about a mix of different
devices introduced gradually over time; and
[the rule] would thereby lower costs,
overcome technical safety problems,
encourage technological development, and
win widespread consumer acceptance–all of
which would promote [the rule's] safety
objectives.

529 U.S. at 874–75.  Because the rule "deliberately sought a
*gradual* phase-in of passive restraints," *id*. at 879, a rule
requiring more immediate implementation would conflict
with federal law and was therefore preempted, *id*. at 881.

Here, we consider not conflict preemption but field
preemption.  But the essential point is the same regarding
phasing in the accessibility requirements: In promulgating its
regulation, the DOT made deliberate choices and devised
nuanced, detailed phase-in requirements, thereby occupying
the field of airport kiosk accessibility for the blind with
regard to timing as well as substantively.  Any accelerated
state-law requirement is therefore preempted.

Finally, our conclusion that the new regulation occupies
the field of kiosk accessability is bolstered, but only
marginally, by DOT's assertions that it does.  As a general
matter, although we may give "'some weight'" to "an
agency's explanation of how state law affects the [relevant]
regulatory scheme," we do "not defer[] to an agency's
*conclusion* that state law is pre-empted."  *Wyeth v. Levine*,
555 U.S. 555, 576 (2009).  "The weight we accord the
agency's explanation of state law's impact on the federal
scheme depends on its thoroughness, consistency, and

persuasiveness." *Id.* (citing *United States v. Mead Corp.*, 533 U.S. 218, 234–35 (2001) and *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

Here, we give DOT's statements minimal weight. DOT's position is that, even before the current kiosk regulation was promulgated, "States [we]re *already* preempted from regulating in the area of disability civil rights in air transportation under the [ADA] and the ACAA." 78 Fed. Reg. at 67,910 (emphasis added).  The government has echoed that view before us, filing a supplemental *amicus* brief in this case maintaining that the DOT's new regulation "further demonstrates that the federal government's regulation of the accessibility of air transportation is so pervasive as to 'occupy the field.'"

The government's view that the field of air carrier accessibility is *broadly* preempted has the virtue of being consistent over time.  *See* Nondiscrimination on the Basis of Handicap in Air Travel, 55 Fed. Reg. 8008, 8014 (Mar. 6, 1990); *cf. Wyeth*, 555 U.S. at 579–80 (rejecting the agency's "newfound opinion" in part because it represented "a dramatic change in position").  As noted, however, under our precedents, the pertinent field for purposes of field preemption analysis is not "air carrier accessibility" in general; it is airport kiosk accessibility for the blind.  DOT's statements do not, as our case law requires, delineate the specific field within which the federal ACAA regulations are preemptive, or explain why § 382.57 in particular occupies the field at issue here.  We therefore find them unpersuasive.

Nevertheless, we do give some weight to DOT's specific rejection of a saving provision in adopting the final kiosk regulation.  In its regulatory commentary, DOT considered

comments, including one submitted by the Federation, urging it to include a saving clause in 14 C.F.R. Pt. 382 to ensure the viability of concurrent state-law claims.  78 Fed. Reg. at 67,910.  The comments had pointed out two district court decisions, including the decision on review in this case, holding preempted certain state law suits challenging inaccessible kiosks.  *Id.*  DOT refused to adopt a saving provision, concluding that "the detrimental impacts resulting from the concurrent operation of State/local disability non-discrimination laws on passengers with disabilities and on air transportation overall are serious and foreseeable."  *Id.*  DOT's rejection of the saving provision, which was proposed and rejected in the context of the exact issue raised here, confirms that DOT meant to leave no space for concurrent regulation of kiosk accessibility by the states.  To that extent, DOT's regulatory discussion bolsters our conclusion that the agency occupied the field of kiosk accessability.

### 3.  *Regulatory Authority*

In its supplemental brief, the Federation argues that its suit does not *conflict* with the new regulation.  In light of our conclusion that DOT has occupied the field, we need not reach that issue.  As to field preemption, the Federation offers no argument that the new regulation is *not* pervasive; indeed, it is hard to see how it could do so.[18]  Rather, apart from the

---

[18] In its opening brief, filed before the current regulation became final, the Federation argued that the *interim* regulation was not pervasive.  It noted that:

> "Federal agencies have shown that they are capable of pervasive regulation of self-service terminals similar to air carrier kiosks, and that type of regulation is absent here.  For example, the comprehensive standards for

argument, which we have already rejected — that implied field preemption is simply inapplicable because of the FAA saving clause — the Federation argues only that the new regulation cannot field preempt its claims because the regulation itself is invalid.  We disagree.

Because we have concluded that DOT "meant to pre-empt" the claims at issue here, the question is simply "whether that action [wa]s within the scope of the [agency's] delegated authority." *de la Cuesta*, 458 U.S. at 154. "[W]hen an agency administrator promulgates pervasive regulations pursuant to his Congressional authority, we may infer a preemptive intent unless it appears from the underlying statute or its legislative history that Congress would not have sanctioned the preemption." *Montalvo*, 508 F.3d at 471.

---

ATMs and fare machines in the 2010 Americans with Disabilities Act Standards for Accessible Design address such details as clear ground or floor space around machine; speech output for instructions, orientation, transaction prompts, error messages, and all information displayed on the machine's screen; privacy of input and output; the need for tactile input controls for all functions; the layout of numeric and function keys; visibility and characters used on the display screen; and volume control."

DOT's final kiosk regulation addresses all or nearly all of these topics. Indeed, the technical specifications in the final regulation were based on the very same 2010 ATM accessibility standards to which the Federation pointed as an example of pervasive regulation.  *See* 78 Fed. Reg. at 67,902–03; *Nondiscrimination on the Basis of Disability in Air Travel: Accessibility of Web Sites and Automated Kiosks at U.S. Airports*, 76 Fed. Reg. 59,307-01 (Sept. 26, 2011).

We conclude that DOT acted within its authority in promulgating the field-preemptive § 382.57.    First, regulations under the ACAA, like § 382.57, are "covered by the FAA's general authorization that the Secretary 'may take action . . . consider[ed] necessary to carry out' the FAA's 'Air Commerce and Safety' provisions, 'including . . . prescribing regulations, standards, and procedures, and issuing orders.'" *Gilstrap*, 709 F.3d at 1000 (quoting 49 U.S.C. § 40113(a)) (first alteration in original).    As *Gilstrap* recognized, the ACAA, as part of the broader FAA, regulates "aviation commerce," including principally "airlines' interactions with their customers who have disabilities," as well as "aviation safety." *Id*. at 1005 & n.14.    Thus, Congress authorized DOT to promulgate regulations that, like § 382.57, speak to United's interactions with its customers with disabilities in the context of its kiosks.

Second, even granting for the sake of argument the Federation's argument that, in enacting the ACAA, "Congress did not in any way suggest that" it wanted to preempt state law, this "narrow focus on Congress' intent to supersede state law [i]s misdirected." *de la Cuesta*, 458 U.S. at 154.    "A pre-emptive regulation's force does not depend on express congressional authorization to displace state law." *Id*. Rather, as we have explained, "the correct focus is on the federal agency that seeks to displace state law and on the proper bounds of its lawful authority to undertake such action." *City of N.Y. v. F.C.C*., 486 U.S. 57, 64 (1988). Nothing in the text or legislative history of the ACAA convinces us that "Congress would not have sanctioned the preemption" intended by the DOT. *Montalvo*, 508 F.3d at 471; *see also Gilstrap*, 709 F.3d at 999–1000, 1006–07 (reviewing the legislative history of the ACAA, and

concluding that DOT's regulation had field-preemptive effect).[19]

Third, we reject the Federation's argument that the regulation is invalid because the ACAA "is limited to prohibiting discrimination in 'air transportation,'" but does not extend to "subsidiary activities" like the operation of airport kiosks that "do not move people or things by aircraft."[20]   The ACAA provides that, "[i]n providing air transportation, an air carrier . . . may not discriminate against an otherwise qualified individual" on the basis of current, past, or perceived disability.  49 U.S.C. § 41705(a).  But we have understood, and continue to understand, the term "[i]n providing air transportation," *id*., broadly, to generally include "airlines' interactions with their customers who have disabilities."  *Gilstrap*, 709 F.3d at 1005 n.14.

In *Gilstrap*, for example, we held that the ACAA regulations occupied the field implicated by Gilstrap's claim that "United did not provide the assistance that Gilstrap requested for *moving through the airports*."  709 F.3d at 1007

---

[19] The Federation points to legislative history indicating that the ACAA was modeled after § 504 of the Rehabilitation Act, argues that the latter Act permits concurrent state regulation, and asks us to infer that Congress therefore intended the same as to the ACAA.  United and the United States point to countervailing indications in the legislative history, including a desire that disabled persons have the benefit of *consistent* accessibility practices.  *See* 55 Fed. Reg. at 8012 (citing legislative history).  Taken together, we are not persuaded that the legislative history establishes Congressional intent to foreclose field-preemptive regulations like the one at issue here.

[20] This argument appears to have been raised for the first time in the Federation's reply brief.  We assume for the sake of argument that it has not been waived.

(emphasis added).  Moving through an airport is not air transportation, yet we concluded that the ACAA regulations validly preempted the application of any different or higher state standard of care as to that issue.  *Id.*  Consistent with *Gilstrap*, we conclude that "[t]he ACAA was intended to ensure nondiscriminatory treatment of airline passengers," *Elassaad v. Independence Air, Inc.*, 613 F.3d 119, 133 (3d Cir. 2010), whether on an airplane, in an airport, at a kiosk, or otherwise.  DOT thus has authority to promulgate regulations, like the one at issue here, that concern the ability to use devices designed to facilitate the provision of airplane transportation.

Fourth, we also reject the Federation's argument that, because Congress did not intend the ACAA to apply to *intra*state air transportation, the Federation's claims, to the extent they relate to purely intrastate travel, are not preempted.[21]  The Federation is correct that the term "air transportation" is defined in the FAA as "foreign air transportation, interstate air transportation, or the transportation of mail by aircraft," apparently exclusive of intrastate air transportation.  49 U.S.C. § 40102(a)(5); *see also* 14 C.F.R. § 298.2 n.1.  But DOT's authority to promulgate regulations is not so constrained as the Federation suggests.  Rather, the Secretary "may take action [he] considers necessary" to effectuate the provisions at issue here.  49 U.S.C. § 40113(a).

United, like most airlines, does not maintain separate kiosks for interstate travel and intrastate travel.  Faced with the likelihood of a single set of kiosks, the Secretary could

---

[21] Again, although the issue was not raised in the district court, we assume for the sake of argument that it has not been waived.

reasonably conclude that a rule governing accessibility of kiosks *in general* is "necessary" to ensure ACAA compliance with regard to interstate travel. Thus, the Federation's argument fails to demonstrate that the regulation is beyond DOT's authority.

Finally, the Federation notes that it has, in a different case, challenged the new regulation's validity under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*., and that, if the challenge is successful, "the rulemaking may be invalidated, in which case there would no longer be any basis for implied preemption of the claims that are subject to this appeal."[22] The filing of a case in a different jurisdiction that *might* lead to the rule's invalidation has no pertinence to the preemption question before this court.[23]

In sum, § 382.57 pervasively and comprehensively regulates the field of airport kiosk accessibility, and is within DOT's delegated authority. We therefore hold that the

[22] The Federation initially filed that suit in the U.S. District Court for the District of Columbia, but that court ruled that it lacked jurisdiction over that case, transferring it to the D.C. Circuit in lieu of dismissal. *See Nat'l Fed'n of Blid v. U.S. Dep't of Transp.*, No. 14-CV-85 (TSC), — F.Supp.3d —, 2015 WL 349156 (D.D.C. Jan. 28, 2015). The case remains pending.

[23] We do not understand the Federation to have argued *in this case* that the regulation is invalid under the APA, notwithstanding its statement that it "adopt[s]" the challenge to the rulemaking. To the extent that the Federation has gestured at such an argument, we decline to address it, both because the Federation has not "specifically and distinctly argue[d]" it, *United States v. Marcia-Acosta*, 780 F.3d 1244, 1250 (9th Cir. 2015) (internal quotation marks omitted), and because it raises an issue essentially different from the one the Federation has heretofore presented on appeal.

Federation's state-law claims are impliedly field preempted under the ACAA.

## CONCLUSION

For the reasons stated above, the Federation's state-law claims are not expressly preempted by the ADA. They are, however, impliedly field preempted by the ACAA and 14 C.F.R. § 382.57. Accordingly, we affirm the district court's dismissal of the Federation's state-law claims.[24]

**AFFIRMED**.

KLEINFELD, Senior Circuit Judge, concurring:

I join Part II of the majority opinion, and concur in the result.

I do not join in Part I of the opinion, because Part II, addressing implied preemption of the field, entirely controls the outcome of this case. The field is preempted by the forty pages in the Federal Register in which the Department of

---

[24] The parties have never suggested that a different result with regard to field preemption is warranted as between the Federation's damages claims and its claims for declaratory and injunctive relief, despite the additional opportunity to do so afforded by our supplemental briefing order. We generally do not reach issues that the parties have not raised. *See, e.g.*, *Eid v. Alaska Airlines, Inc.*, 621 F.3d 858, 875 (9th Cir. 2010) ("Because plaintiffs don't make a [potentially dispostive] argument, we say nothing on that score."). Particularly in light of the lack of any California authority addressing whether that State's law *does* impose a different standard for kiosk accessability, we decline to do so in this case.

Transportation has addressed service to disabled passengers.[1] Nothing needs to be said about express preemption, so nothing should be said. I cannot think of a good reason for us to speak at considerable length about a subject that does not in the slightest affect the decision of the case before us.

Federal preemption under the Airline Deregulation Act is a complex and nuanced body of law. I do not express agreement or disagreement with anything in the majority's unnecessary discussion of express preemption. By adding many words to the Federal Reporter about it, we have made the subject even more complex.

The reason why express preemption is a complex and delicate subject is that the Airline Deregulation Act preempts state laws "related to a price, route, or service of an air carrier,"[2] and we and our sister circuits have read "service" in differing ways.[3] Since we need not further complexify the

---

[1]   *See* Nondiscrimination on the Basis of Disability in Air Travel, 78 Fed. Reg. 67,882–924 (Nov. 12, 2013) (codified at 14 C.F.R. pts. 382, 388, 399, and 49 C.F.R. pts. 27, 382).

[2] 49 U.S.C. § 41713(b)(1).

[3] *See Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1266 (9th Cir. 1998) (en banc) ("Congress used the word 'service' in the phrase 'rates, routes, or service' in the ADA's preemption clause to refer to the prices, schedules, origins and destinations of the point-to-point transportation of passengers, cargo, or mail."); *Taj Mahal Travel, Inc. v. Delta Airlines, Inc.*, 164 F.3d 186, 193–94 (3d Cir. 1998) (adopting the *Charas* definition). *But see Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 336 (5th Cir. 1995) (en banc) (holding that "Congress intended to de-regulate as 'services'" "items such as ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself"); *see also Bower v. Egyptair Airlines Co.*, 731 F.3d

meaning of "service," we should not. Much can be said, and need not be said in this case, about whether our construction of "service" in *Charas v. Trans World Airlines, Inc.* is consistent with, or qualified or overruled by, the Supreme Court decision in *Rowe v. New Hampshire Motor Transport Ass'n*.[4] We should not address that question in a decision on which it has no bearing.

Because the lengthy first section of the majority opinion is an entirely unnecessary disquisition on a subject of no significance to the outcome, it should be regarded as dicta of no precedential force. That too is a complex issue in our circuit because of our court's departure from the common law tradition regarding dicta and holding. That oddity in our circuit law generates more complexity into the question of whether the agency and subsequent panels are bound by Part I of today's opinion.

---

85, 94 (1st Cir. 2013) (adopting the *Hodges* definition); *Branche v. Airtran Airways, Inc.*, 342 F.3d 1248, 1257 (11th Cir. 2003) (same); *Arapahoe Cnty. Pub. Airport Auth. v. F.A.A.*, 242 F.3d 1213, 1222 (10th Cir. 2001) (quoting *Hodges*); *Smith v. Comair, Inc.*, 134 F.3d 254, 259 (4th Cir. 1998) (citing *Hodges*); *Travel All over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1433 (7th Cir. 1996) (adopting the *Hodges* definition).

[4] *See Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 645 (9th Cir. 2014) (arguing that, in regards to a statute analogous to the ADA, "*Rowe* did not . . . . call into question our past FAAAA cases"). *But see Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 223 (2d Cir. 2008) (per curiam) (*"Charas*'s approach, we believe, is inconsistent with the Supreme Court's recent decision in *Rowe*. There, the Court necessarily defined 'service' to extend beyond prices, schedules, origins, and destinations."); *see also Bower v. Egyptair Airlines Co.*, 731 F.3d 85, 94 (1st Cir. 2013) ("*Rowe* forecloses the *Charas* interpretation of 'service' as a term closely related to prices and routes.").

Our circuit, unlike traditional common law courts, the Supreme Court,[5] and our sister circuits,[6] purports in *Barapind v. Enomoto*[7] to treat all our considered pronouncements, whether necessary to the decision or not, as binding law.  Our anomalous language in *Barapind* says that if "[w]e addressed the issue and decided it in an opinion joined in relevant part by a majority of the panel[,] . . . . [it] became law of the circuit, regardless of whether it was in some technical sense 'necessary' to our disposition of the case."[8]  The good and traditional reasons for stare decisis are that like cases ought as a matter of justice to be treated alike, and that stability in the law benefits those who wish to conduct their activities in compliance with and reliance on it.  When cases are not alike, the common law method is to determine whether to extend or

---

[5] *Carroll v. Carroll's Lessee*, 57 U.S. 275, 287 (1853) ("[T]his court and other courts organized under the common law, has never held itself bound by any part of an opinion, in any case, which was not needful to the ascertainment of the right or title in question between the parties.").

[6] *See United States v. Matchett*, 802 F.3d 1185, 1195 (11th Cir. 2015); *Arcam Pharm. Corp. v. Faria*, 513 F.3d 1, 3 (1st Cir. 2007); *Hearn v. Dretke* (*In re Hearn*), 376 F.3d 447, 453 (5th Cir. 2004); *Cal. Pub. Employees' Ret. Sys. v. WorldCom, Inc.*, 368 F.3d 86, 106 n.19 (2d Cir. 2004); *DaimlerChrysler Corp. v. United States*, 361 F.3d 1378, 1384 (Fed. Cir. 2004); *Figg v. Schroeder*, 312 F.3d 625, 643 n.14 (4th Cir. 2002); *PDV Midwest Ref., L.L.C. v. Armada Oil & Gas Co.*, 305 F.3d 498, 510 (6th Cir. 2002); *Wilder v. Apfel*, 153 F.3d 799, 803 (7th Cir. 1998); *Rohrbaugh v. Celotex Corp.*, 53 F.3d 1181, 1184 (10th Cir. 1995); *Robinson v. Norris*, 60 F.3d 457, 460 (8th Cir. 1995); *United States v. Ricks*, 5 F.3d 48, 50 (3d Cir. 1993) (per curiam); *Noel v. Olds*, 138 F.2d 581, 586 (D.C. Cir. 1943).

[7] *Barapind v. Enomoto*, 400 F.3d 744, 750–51 (9th Cir. 2005) (en banc) (per curiam).

[8] *Id.* at 751 (footnote omitted).

distinguish and limit pronouncements in prior cases, not to treat all the pronouncements like statutes. Part I of the majority opinion appears to be an attempt to write a binding gloss on what is a "service," but confusion about whether, in our circuit, it has any precedential force undermines whatever value it might have as guidance.

There are good reasons why courts write dicta. Often dicta make the discussion of the law easier to understand, such as by discussing hypothetical and analogous cases. Language in a decision unnecessary to the decision often has value, for making the decision easier to understand, courts easier to predict, and decisions whether to expand or restrict holdings easier to make. Much dicta is written accidentally, because a judge explaining why the court reaches its outcome in one case will not be able to perceive every factual circumstance that will arise in the future, and potentially be covered by an accidentally overbroad rule articulated in the instant case. Part I of today's opinion is dicta for no such good reason.

Instead, it is a prime example of what Judge Rymer, in her dissent in *Barapind*, called overwriting invited by the *Barapind* majority opinion.**[9]** The Constitution gives us authority to decide only "Cases and Controversies."**[10]** The federal courts do not have authority to issue advisory

---

**[9]** *Id.* at 759 (Rymer, J., concurring in the judgment in part and dissenting in part) ("[T]he majority's approach . . . invites overwriting that may be difficult or impossible to cure.").

**[10]** *Chafin v. Chafin*, — U.S. —, 133 S. Ct. 1017, 1023 (2013) (quotations omitted); *see* U.S. Const. art. III.

opinions.[11]  Yet that is what Part I is.  The judicial power we wield is "to determine actual controversies arising between adverse litigants," not to make law on issues that do not determine the parties' controversy.[12]

   *Barapind* claims authority to bind subsequent panels and district courts by dicta as part of our "supervisory function."[13] But it is doubtful that there is any such authority, particularly when a three-judge panel purports to exercise it.[14]  Congress located supervisory power in the Judicial Conference of the United States[15] and the Judicial Council of the Ninth Circuit.[16] We make general rules for our court by Local Rules pursuant to Rule 47 of the Federal Rules of Appellate procedure. While we claim more authority for our en banc panels of eleven judges in our twenty-nine-judge court,[17] we have not claimed it for three-judge panels.

---

[11] *United States v. Fruehauf*, 365 U.S. 146, 157 (1961).

[12] *Muskrat v. United States*, 219 U.S. 346, 361 (1911).

[13] *Barapind*, 400 F.3d at 751 n.8.

[14] *But see Miller v. Gammie*, 335 F.3d 889, 902–04 (9th Cir. 2003) (en banc) (Tashima, J., concurring).

[15] 28 U.S.C. § 331.

[16] *See id.* § 332.

[17] *See Barapind*, 400 F.3d at 751 n.8.

"Everything that ends up in F.3d cannot possibly be the law of the circuit."[18]   Since Part I of the majority opinion is entirely unnecessary to the decision in this case, I see no reason why future panels or anyone else would be bound by it.   Writing what purports to be law of the circuit entirely outside the necessity of deciding the case before us increases the risk of troublesome error, and of exercising power beyond our authority.   Judge Leval of the Second Circuit attacked *Barapind* as "announcing a rule, irrespective of whether the rule plays any functional role in the court's decision of the case—a very considerable power, and without constitutional justification."[19]   He suggests a "blatant" hypothetical:

What if we in the Second Circuit, without any filed dispute between parties, were to publish a tract entitled *In re Securities Litigation*, in which we promulgated a compendium of rules to govern securities cases?  I think all would agree that we lack constitutional authority to establish binding law in this fashion.

Then what if, when a securities dispute comes before us, after giving judgment on the disputed issue, we go on to say, "Having focused our attention on the subject of securities litigation, we will go beyond the particular issue in dispute and proclaim a set

---

[18] *Id.* at 759 (Rymer, J., concurring in the judgment in part and dissenting in part).

[19] Pierre N. Leval, *Judging Under the Constitution: Dicta About Dicta*, 81 N.Y.U. L. Rev. 1249, 1251 (2006).

of rules to be followed." Is this meaningfully different from the previous example?[20]

That is what Part I of the majority opinion is, and, as Judge Leval says of his hypothetical case, "It is beyond our authority."[21] As Judge Rymer wrote, "Views of two or three judges in an opinion on matters that are not necessarily dispositive of the case are no different from the same views expressed in a law review article; neither should be treated as a judicial act that is entitled to binding effect."[22]

Part I of the majority opinion does not use dicta as an explanatory aid, an often useful practice. It is not important to the decision in this case, just discussion that might arguably be useful in some other case. But when we purport to articulate law not affecting the decision of a case, our likelihood of error increases. Practicing lawyers, district judges, and subsequent appellate panels often experience difficulty reaching what they agree is a sensible result, because of excess language in a case resolved on a different ground. We should police our opinions to prevent that kind of surplus language. Part II of the majority opinion fully resolves this case. Part I has no bearing on its resolution, so, right or wrong, it raises a question of whether it really is circuit law, even as it attempts to articulate circuit law.

---

[20] *Id.* at 1260.

[21] *Id.*

[22] *Barapind*, 400 F.3d at 759 (Rymer, J., concurring in the judgment in part and dissenting in part).